The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader. The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
Date July 3, 2019

## 2019COA102

**No. 17CA2102, *Sedgwick Props. Dev. Corp. v. Hinds* — Business
Organizations — Limited Liability Companies — Piercing the
Corporate Veil**

A division of the court of appeals concludes that the district
court erred in finding that a developer services corporation that
contracted with a single-member, single-purpose limited liability
company (LLC) to manage the LLC was the alter ego of the LLC for
purposes of piercing the corporate veil.

The division determines that the veil-piercing analysis
applicable to corporations must be harmonized with statutes
governing LLCs, and that certain aspects of traditional veil-piercing
analysis are not applicable to a single-member, single-purpose LLC
that is managed by another entity under a contract to provide
management services to the LLC. A court undertaking a

veil-piercing analysis as to such an LLC must take into account the inherent characteristics of such an entity. The district court did not do so in this case, instead relying on factors that are inapplicable in the context of such an entity.

Because the evidence presented was insufficient to establish alter ego status, the division reverses the judgment piercing the corporate veil to hold Sedgwick Properties Development Corporation liable for a judgment entered against 1950 Logan, LLC, and remands the case for entry of judgment in Sedgwick's favor.

COLORADO COURT OF APPEALS                    **2019COA102**

Court of Appeals No. 17CA2102
City and County of Denver District Court No. 13CV33659
Honorable Ross B. Buchanan, Judge

Sedgwick Properties Development Corporation, as Garnishee of 1950 Logan,
LLC,

Appellant,

v.

Christopher Hinds,

Appellee.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division V
Opinion by JUDGE TERRY
Grove, J. concurs
J. Jones, J., specially concurs

Announced July 3, 2019

Hall Estill, E. Job Seese, Denver, Colorado, for Appellant

Salazar Law, LLC, Joseph A. Salazar, Thornton, Colorado, for Appellee

¶ 1     This appeal by Sedgwick Properties Development Corporation (Sedgwick) requires us to harmonize statutory law permitting the creation of a single-member limited liability company (LLC) with the judicially created doctrine of piercing the corporate veil.

¶ 2     In 2013, the Colorado Civil Rights Commission (Commission) sued 1950 Logan, LLC (1950 Logan), a single-member, single-purpose LLC, and obtained a default judgment against that entity.  1950 Logan had been created for the sole purpose of building the Tower on the Park condominium building and selling the units in that building.

¶ 3     The Commission claimed that 1950 Logan had violated the civil rights of appellee, intervenor Christopher Hinds — a disabled person who uses a wheelchair and owns a unit in the building — by selling the building's handicapped parking spaces to non-handicapped buyers, years before Hinds bought his condo unit.  Hinds intervened in the suit and got a default judgment against 1950 Logan.  (The Commission does not appear on appeal.)

¶ 4     By the time Hinds sought to collect on the judgment, the condo development had long since been completed, management of the property had been turned over to a homeowners' association

1

(HOA), and 1950 Logan — its single purpose accomplished — had wound down operations and no longer had any assets.

¶ 5     Hinds filed a garnishment proceeding seeking to pierce the corporate veil of 1950 Logan to recover the judgment from Sedgwick, which Hinds alleged was the alter ego of 1950 Logan (even though Sedgwick had no ownership interest in 1950 Logan). Sedgwick is a developer services company that was hired under a contract to manage 1950 Logan and to oversee the development and marketing of the condo project.

¶ 6     After Sedgwick filed a traverse to the garnishment, the district court held an evidentiary hearing and pierced the corporate veil to hold Sedgwick liable to pay Hinds for the judgment against 1950 Logan.  Sedgwick appeals the judgment piercing the corporate veil to reach its assets.

¶ 7     Because we conclude that Hinds did not present sufficient evidence to support a finding that Sedgwick was 1950 Logan's alter ego, we reverse without addressing the other elements required for piercing the corporate veil.

¶ 8     As part of our analysis, we discuss certain factors of the alter ego rubric on which the district court relied, but which carry little

weight in the context of a single-member, single-purpose LLC such as 1950 Logan that hired a management company to manage its affairs.

I.    The Traverse Hearing Was Sufficient to Protect Sedgwick's Due Process Rights

¶ 9    We begin by addressing Sedgwick's contention that its procedural due process rights were violated because it did not receive adequate notice of the attempt by Hinds to pierce the corporate veil to reach Sedgwick's assets.  Sedgwick argues that, as a result, it did not have an adequate opportunity to respond to the factual allegations of the complaint.  Sedgwick's argument boils down to this: if an entity might later be garnished in the event of a judgment against a defendant that has some relation to the entity, the entity must be served with notice and given an opportunity to defend the underlying suit.  We reject this notion.

¶ 10    Nothing in Colorado law prohibits a judgment creditor from asserting a claim to pierce the corporate veil in a garnishment proceeding to collect on the judgment.  And we see no due process violation that would arise from such a procedure.  This is so

because a garnishment proceeding adequately allows the garnishee to contest the garnishment.

¶ 11 In its answer under C.R.C.P. 103, section 4, to the writ of garnishment, Sedgwick asserted that it did not possess or control any payments, obligations, or assets of 1950 Logan. This assertion prompted Hinds to file a traverse under C.R.C.P. 103, section 8, seeking to hold Sedgwick liable by piercing the corporate veil to reach assets that he contended belonged to 1950 Logan. The district court held a hearing on the traverse under C.R.C.P. 103, section 8(b)(2).

¶ 12 These proceedings adequately protected Sedgwick's due process rights. *See Maddalone v. C.D.C., Inc.*, 765 P.2d 1047, 1049 (Colo. App. 1988). *Maddalone* recognized that garnishment procedures under C.R.C.P. 103 accord with due process and fully protect a garnishee who denies liability for a debt. *Id.* The garnishee is treated no differently than if it had been sued directly on the debt, and has the right to deny the debt, engage in discovery, and have an adversary hearing in which the judgment creditor must prove the allegations against the garnishee by a preponderance of the evidence. *Id.*

¶ 13    In the traverse hearing, the district court allowed garnishee Sedgwick to (1) cross-examine the witness called by garnishor Hinds; (2) challenge the evidence Hinds presented; and (3) present Sedgwick's own witness testimony and evidence.  These procedures are consistent with the due process rights of a garnishee.  *See Gen. Accident Fire & Assurance Corp. v. Mitchell*, 120 Colo. 531, 539, 211 P.2d 551, 555 (1949) (burden of proof is on the garnishor to establish by a preponderance of the evidence all the facts on which it relies to charge the garnishee); *Anderson Boneless Beef, Inc. v. Sunshine Health Care Ctr.*, 852 P.2d 1340, 1343 (Colo. App. 1993) (same); *see also Struble v. Am. Family Ins. Co.*, 172 P.3d 950, 955 (Colo. App. 2007) (reviewing the record before the district court and concluding there were no issues of material fact as to issuance of an insurance policy by the garnishee to the judgment debtor).

¶ 14    We now move to the merits of Sedgwick's substantive contentions.

II.    Corporate Veil-Piercing of a Single-Member, Single-Purpose LLC

¶ 15    A duly formed corporation is treated as a separate legal entity, unique from its officers, directors, and shareholders.  *In re Phillips*,

139 P.3d 639, 643 (Colo. 2006). The fiction of the corporate veil isolates "the actions, profits, and debts of the corporation from the individuals who invest in and run the entity." *Id.* Only extraordinary circumstances justify disregarding the corporate entity to impose personal liability. *Id.* at 644.

¶ 16    Colorado's appellate courts have not previously addressed corporate veil-piercing in the context we encounter today: a single-member, single-purpose LLC that is managed under a contract by another company (in this case, 1950 Logan, which was managed by Sedgwick). *Cf. Highlands Ranch Univ. Park, LLC v. Uno of Highlands Ranch, Inc.*, 129 P.3d 1020, 1022 (Colo. App. 2005) (noting that an LLC party in that case was "a single-purpose entity created for the sole purpose of entering into the lease at issue").

¶ 17    Single-member LLCs are permitted by statute, § 7-80-204(1)(g), C.R.S. 2018, and may be formed for any lawful business purpose, § 7-80-103, C.R.S. 2018.

A. Burden of Proof for Veil-Piercing: Preponderance of Evidence

¶ 18    The burden of proof for establishing a claim to pierce the corporate veil has been the subject of inconsistent judicial precedent.

6

¶ 19    In *In re Phillips*, 139 P.3d at 644, the supreme court said that the burden of proof is by "clear and convincing" evidence.  But the same court in *Griffith v. SSC Pueblo Belmont Operating Co. LLC*, 2016 CO 60M, ¶ 12, concluded that this language from *Phillips* was mere dictum.  The court instead applied section 13-25-127(1), C.R.S. 2018, which mandates that "[a]ny provision of the law to the contrary notwithstanding and except as provided in subsection (2) of this section, the burden of proof in any civil action shall be by a preponderance of the evidence."

¶ 20    A year after announcing *Griffith*, however, the supreme court decided *Stockdale v. Ellsworth*, 2017 CO 109, and once again said that the burden of proof for piercing the corporate veil is "clear and convincing" evidence.  *Id.* at ¶ 23.  But the supreme court was not called on in *Stockdale* to decide the burden of proof issue.  And it provided no reasoning as to why a burden of proof contrary to the one set out in section 13-25-127(1) and endorsed in *Griffith* should apply to veil-piercing cases.  We therefore conclude that this language from *Stockdale* was dictum, and we instead apply *Griffith*'s ruling that the burden of proof is by a preponderance of the evidence, as required by statute.

## B. Elements of Veil-Piercing

¶ 21     To determine whether it is appropriate to pierce the corporate veil, a court must conduct a three-part inquiry.  First, the court must determine whether the corporate entity is the alter ego of the person or entity in issue.  *Phillips*, 139 P.3d at 644.  Second, it must determine whether justice requires recognizing the substance of the relationship between the person or entity sought to be held liable and the corporation over the form, because the corporate fiction was "used to perpetrate a fraud or defeat a rightful claim."  *See id.* (citation omitted).  Third, the court must consider whether an equitable result will be achieved by disregarding the corporate form and holding a shareholder or other insider personally liable for the acts of the business entity.  *Id.*

¶ 22     We review de novo a trial court's legal conclusions in finding alter ego status and examine its related findings of fact for clear error.  *Colo. Coffee Bean, LLC v. Peaberry Coffee Inc.*, 251 P.3d 9, 29 (Colo. App. 2010).

## C. 1950 Logan's Ownership Structure

¶ 23     The ownership information that was presented to the trial court consists primarily of a signature page for the 1950 Logan

condominium declarations and Sedgwick's answers to interrogatories.

¶ 24    The condominium declarations signature page shows that 1950 Logan had the following structure: "1950 Logan, LLC, a Colorado limited liability company[,] By: 1950 Logan II, LLC, a Colorado limited liability company, its Manager[,] By: 1950 Logan Management, LLC, a Colorado limited liability company, its Manager[,] By [signature] Name: F. Martin Paris, Jr.[,] Title: Manager."  1950 Logan's interrogatory response says, "[t]he name of each owner, general or limited partner, or member owning 5% or more of [1950 Logan] is 1950 Logan II, LLC . . . ."

¶ 25    There are other references in the record to 1950 Logan III, LLC, of which Sedgwick's principal, Paris, was a member, as well as references to 1950 *North* Logan III, LLC, of which Paris was also a member, and both of these entities appear to have had an ownership interest in 1950 Logan II, LLC.  (As discussed below, the district court referred to these entities as "Roman II and Roman III.")

¶ 26    The response to an interrogatory states that, until August 2003, Sedgwick served as the initial corporate manager for 1950

Logan, as well as for 1950 Logan II, LLC. And Sedgwick was "paid a fee in exchange for development services, which include marketing, general coordination of the construction of the development of 1950 Logan, and lender management."

¶ 27 Paris testified that the multi-tiered ownership structure of 1950 Logan was adopted to fulfill a requirement of Lehman Bros., one of the lenders on the condo development project.

¶ 28 In sum, the uncontradicted evidence before the district court was that 1950 Logan is a single-member LLC whose sole member is 1950 Logan II, LLC.

### D. Lack of Ownership by Sedgwick

¶ 29 No evidence was presented that Sedgwick *owned* 1950 Logan. Instead, the district court found that Sedgwick *managed* 1950 Logan. *See* § 7-80-102(8) & (9), C.R.S. 2018 (distinguishing members — who have ownership interest in an LLC — from managers — who do not have ownership interest unless they are also members); *cf.* § 7-80-107(1), C.R.S. 2018 (providing that *members* of LLCs can be held liable based on piercing the corporate veil jurisprudence, but not addressing managers); § 7-80-705, C.R.S. 2018 (members and managers of LLCs are not liable for

judgments, debts, or liabilities of those companies); *Weinstein v. Colborne Foodbotics, LLC*, 2013 CO 33, ¶ 23 (overruling *Sheffield Services Co. v. Trowbridge*, 211 P.3d 714 (Colo. App. 2009), and holding that the manager of an insolvent LLC does not owe the LLC's creditors the same fiduciary duties that an insolvent corporation's directors owe to the corporation's creditors).

¶ 30    One might question whether a court can pierce the corporate veil to hold liable a non-owner company that merely provided management services to an LLC.  But because no party raised this issue, we do not decide it.

¶ 31    Instead, we follow the "cardinal principle of judicial restraint — if it is not necessary to decide more, it is necessary not to decide more."  *Mulberger v. People*, 2016 CO 10, ¶ 23 (Gabriel, J., concurring in the judgment) (quoting *PDK Labs. Inc. v. United States Drug Enf't Admin.*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment)).  Accordingly, we proceed to address the issues raised by the parties and considered by the district court in its analysis of the alter ego issue.

## E. Legal Underpinnings of Alter Ego Analysis

¶ 32     In determining whether a corporate entity is the alter ego of the person or entity in issue, courts consider a variety of factors, including whether (1) the corporation is operated as a distinct business entity; (2) funds and assets are commingled; (3) adequate corporate records are maintained; (4) the nature and form of the entity's ownership and control facilitate misuse by an insider; (5) the business is thinly capitalized; (6) the corporation is used as a "mere shell"; (7) legal formalities are disregarded; and (8) corporate funds or assets are used for noncorporate purposes.  *Phillips*, 139 P.3d at 644; *Leonard v. McMorris*, 63 P.3d 323, 330 (Colo. 2003). This inquiry looks to the specific facts of each case, and not all of the listed factors need to be shown in order to establish alter ego status.  *Great Neck Plaza, L.P. v. Le Peep Rests., LLC*, 37 P.3d 485, 490 (Colo. App. 2001).

## F. Statutory Basis for Different Treatment of Limited Liability Companies in the Veil-Piercing Context

¶ 33     The district court addressed the various factors generally pertinent to piercing the corporate veil.  Its analysis foundered, however, on the assumption that a single-member, single-purpose

LLC is subject to the same veil-piercing analysis generally applied to corporations, without taking into account the characteristics of such LLCs. We acknowledge the difficulty faced by the district court, given the dearth of precedent addressing those characteristics.

¶ 34 As relevant here, the Colorado Limited Liability Company Act provides:

> (1) In any case in which a party seeks to hold the members of a limited liability company personally responsible for the alleged improper actions of the limited liability company, the court shall apply the case law which interprets the conditions and circumstances under which the corporate veil of a corporation may be pierced under Colorado law.

> (2) For purposes of this section, *the failure of a limited liability company to observe the formalities or requirements relating to the management of its business and affairs is not in itself a ground for imposing personal liability on the members for liabilities of the limited liability company.*

§ 7-80-107(1)-(2) (emphasis added).

¶ 35 Given these statutory provisions, a court determining whether to pierce the corporate veil of an LLC must tread carefully and must consider whether traditionally applied veil-piercing factors are

applicable in the context of such a company. *See* 2 Larry E. Ribstein & Robert R. Keatinge, *Ribstein and Keatinge on Limited Liability Companies* § 15:3, Westlaw (database updated June 2019) (collecting cases discussing application of traditional veil-piercing factors to LLCs).

¶ 36    The court should tread even more carefully where the company in question is a single-member LLC.  For example, a traditional veil-piercing analysis focuses, in part, on whether a corporation observes corporate formalities, such as holding board of directors meetings and keeping minutes of such meetings.  *See Phillips*, 139 P.3d at 646.  But, as we discuss below, some of those factors simply do not apply in the context of single-member LLCs.

¶ 37    And where, as here, management of the LLC is provided under contract by a management company, traditional veil-piercing factors may be even harder to apply.

G. Alter Ego Findings Relied on by the District Court to Pierce the Veil

¶ 38    We conclude that the record, considered as a whole, does not support an alter ego finding that would permit piercing 1950 Logan's corporate veil.

14

¶ 39　　As discussed above, it is uncontested that 1950 Logan was a single-member LLC, whose sole member was 1950 Logan II, LLC, and that Sedgwick merely managed 1950 Logan's affairs under a management contract.  Sedgwick's principal, Paris, testified that there were numerous real estate projects for which Sedgwick has provided the same types of development services it provided under its contract with 1950 Logan.

¶ 40　　Though the district court framed the first issue before it as "whether . . . the LLC is the alter ego of its *manager*" (emphasis added) — apparently referencing Sedgwick — it is unclear whether the court recognized that Sedgwick was the manager under a management contract and was not an owner-manager of the entity.

¶ 41　　In any event, several of the district court's findings of fact relating to the alter ego determination do not necessarily show a disregard of the corporate form.  Though the court found them indicative of alter ego status, they are also consistent with 1950 Logan's operation as a single-member LLC, as well as with Sedgwick's role as manager of the entity through a contract to provide such services.  *See* § 7-80-102(8) (defining "manager" of limited liability company); § 7-80-402, C.R.S. 2018 (addressing

15

designation of manager of limited liability company); § 7-80-404, C.R.S. 2018 (specifying duties of managers). We next address the veil-piercing factors that the district court deemed pertinent here.

### 1. Ownership, Control, and Unity of Interest

¶ 42  As to the ownership element, the court noted Paris's testimony that "Sedgwick actually had no interest in 1950 Logan." Nevertheless, the court found that Sedgwick controlled the entity, finding specifically that

- Sedgwick completely dominated 1950 Logan;

- Sedgwick made all decisions for 1950 Logan;

- Sedgwick wrote all of the checks on 1950 Logan's bank account;

- 1950 Logan had no employees;

- 1950 Logan had no board of directors or other LLC members;

- Sedgwick was "entirely in charge of whatever movement there was" of assets; and

- Sedgwick was the one that made applications for 1950 Logan to be paid by the title company for items related to development of the condo building.

16

¶ 43    The court made further findings relating to Paris.  As noted above, he was the principal of Sedgwick, which was hired under a contract to provide management services to 1950 Logan, as permitted by section 7-80-402.

¶ 44    Although the court found that Paris was the only class A shareholder of 1950 Logan, the record does not support that finding.  Instead, the record shows that he was a class A shareholder of *1950 Logan III, LLC* — a separate entity from 1950 Logan.  (Other evidence showed that Paris was a shareholder of 1950 *North* Logan III, LLC.)

¶ 45    Be that as it may, it is unclear how this finding about *Paris* could support the conclusion that *Sedgwick* was the alter ego of 1950 Logan.  The court did not find that Sedgwick and Paris were the alter egos of each other, and it seems to have conflated the two in concluding that Sedgwick's assets are available to satisfy the judgment against 1950 Logan — even though it found that Sedgwick had no interest in 1950 Logan.

¶ 46    The same conflation seems to affect the following findings that the district court made about Paris:

- "1950 Logan had no other class A shareholders to restrict Paris (president of Sedgwick and manager of 1950 Logan) in his decision-making";

- Paris, on behalf of 1950 Logan, signed a 2009 settlement agreement, settling a construction defect lawsuit brought by the HOA against 1950 Logan; and

- 1950 Logan was "dominated in a very dramatic sense by Sedgwick and Marty Paris, its [principal]."

¶ 47    To the extent these findings are supported by the record, they do not tend to show ownership of 1950 Logan by *Sedgwick* or unity of interest between those entities.  And, as noted above, Sedgwick was hired under a contract to manage 1950 Logan, which itself had no employees.  The court's findings do not show control by Sedgwick beyond what would be expected under the contractual role of manager of the LLC.

¶ 48    The court's ruling appears to ignore — without explaining why — other evidence that would tend to show that Sedgwick did *not* exercise control over 1950 Logan beyond what would be expected under its contractual management agreement:

- Paris testified that Sedgwick had no ownership interest in, and never made a profit from, the Tower on the Park project.

- When asked whether Sedgwick ever had possession or control of any assets of any of the 1950 Logan, LLC, entities, Paris responded, "No, just a contractual relationship to manage them." He explained that "[p]art of the services agreement that Sedgwick signed for 1950 Logan, LLC, was to manage the business affairs of the LLC."

- About $30 million was borrowed from institutional investors to build the building. The funds went into a construction escrow account and were never deposited in Sedgwick's own account. Sedgwick would forward requests to pay subcontractors and vendors to the lending bank and title company for disbursements. The fees that Sedgwick earned for its own work in managing the project were paid through the construction escrow to Sedgwick's account.

- Paris testified that Sedgwick provided the following management services to the project: "Sedgwick's knowledge and expertise is in the process of managing the real estate development. So they manage the capital sources, the equity,

19

the debt, insurance, the general contractor, the permitting process, the architect, the buyer selection process, the wholesales and marketing process. [There are] probably 30 items in our services agreement that Sedgwick is responsible [for] managing as part of their contractual relationship with the single purpose [limited liability company, referencing 1950 Logan]." He said that Sedgwick was a "cradle to grave service provider for the ownership entity." According to Paris, Sedgwick has provided the same services with respect to other real estate development projects and is "fully indemnified by the [project's] ownership for [those] services."

- Sedgwick's attorney testified that Sedgwick has its own assets and bank accounts and does not commingle them with those of the entities it manages. Paris testified, "Sedgwick's money was Sedgwick's money and . . . 1950 Logan's money was 1950 Logan's money. They are separate businesses, separate business structures, only connected by a service agreement [—a] contract for services."

- Sedgwick's attorney testified that, on the date of the garnishment, Sedgwick did not have possession or control of assets of 1950 Logan.

¶ 49 The record simply does not support the court's finding that Sedgwick had the type of ownership and control over 1950 Logan necessary to establish alter ego status.

### 2. Failure to Observe Corporate Formalities

¶ 50 The district court also based its alter ego finding on what it saw as Sedgwick's failure to observe the usual corporate formalities. The court found the following:

- "[T]here was no board of directors, . . . no one for Mr. Paris to answer to directly," and, relatedly, that "there was no evidence that there was any board of director approval of anything or any activity or steps that Mr. Paris took[.]"

- "[T]here were no . . . minutes of meetings of any board of directors in . . . 1950 Logan."

¶ 51 But in the context of a single-member LLC — and particularly one that is run under contract with a management company — we conclude that these factors do not weigh in favor of finding alter ego status. *See* § 7-80-107(2).

21

¶ 52    "LLCs are often operated with less formality [than traditional corporations] and may not have regular meetings of members or managers, or observe other procedures that are required for corporations."  1 Stephen A. Hess, *Colorado Practice Series: Methods of Practice* § 5:9, Westlaw (8th ed. database updated May 2019).  "As an example, the Colorado Business Corporation Act requires corporations to hold annual meetings of shareholders under section 7-107-101[, C.R.S. 2018].  There is no similar requirement for annual meetings of the members of an LLC under the LLC Act."  *Id.* at n.10; *cf. id.* at § 5:9 ("The provision in the LLC Act that the failure to observe formalities is not itself a ground to impose liability . . . may actually remove a procedural protection for LLCs otherwise available to Colorado corporations.  However, to avoid that result, one might argue that, although the failure to follow corporate formalities may *not alone* cause the LLC 'veil' to be pierced, the fact that the LLC has followed formalities can still be a positive factor to maintain the LLC 'veil.'").

3. Whether the Entity's Form Facilitates Misuse by an Insider

¶ 53    The district court found that 1950 Logan and what it referred to as "Roman II and Roman III" were "all rolled into one for

22

purposes of operations and for purposes of [filing] their single tax return."  *Cf.* § 7-80-107(3) ("A limited liability company's status for federal tax purposes does not affect its status as a distinct entity organized and existing under this article.").

¶ 54    Assuming, without deciding, that the record supports that finding, those circumstances do nothing to establish *Sedgwick* as an alter ego of 1950 Logan, even given the court's finding that "Mr. Paris managed that whole structure."  Thus, the court's finding that "the nature and form of ownership and control does facilitate misuse by an insider" cannot support piercing the veil to get to Sedgwick's assets.

### 4. Mere Shell

¶ 55    As the district court found, 1950 Logan did not constitute a "mere shell."  *See Phillips*, 139 P.3d at 644 (listing whether corporation is operated as a "mere shell" as one factor in determining alter ego status).

### 5. Capitalization

¶ 56    Undercapitalization of the subject entity is one indicator that may support piercing of the corporate veil, *see, e.g., McCallum Family, L.L.C. v. Winger*, 221 P.3d 69, 76 (Colo. App. 2009), and the

court relied heavily on this factor in deciding to pierce the veil to reach Sedgwick's assets. After reviewing the uncontroverted evidence, however, we cannot agree with the district court that 1950 Logan was thinly capitalized.

¶ 57 The court recognized that 1950 Logan owned the land on which the condo development was built, but found that "the land itself only acquired value as the project proceeded and approached completion."

¶ 58 It is very apparent from the record that the land had intrinsic value for its development potential. Based in no small part on its ownership of that land, 1950 Logan raised more than $1 million from "friends and family" types of investors, was able to obtain funding from major institutional lenders to build the building, sold all the units in the building, and paid off more than $30 million in loans. These facts necessarily show that the entity was not "thinly capitalized." *Cf. McCormick v. City of Dillingham*, 16 P.3d 735, 744 (Alaska 2001) (undercapitalization proved where corporate entity could not procure a loan); *66, Inc. v. Crestwood Commons Redevelopment Corp.*, 998 S.W.2d 32, 40 (Mo. 1999) (finding undercapitalization when corporate entity "never had any assets,

24

net worth, [or] bank accounts"); *S. Lumber & Coal Co. v. M.P. Olson Real Estate & Constr. Co.*, 426 N.W.2d 504, 509 (Neb. 1988) (citing *Brown v. Alron, Inc.*, 388 N.W.2d 67, 71-72 (Neb. 1986), and noting that corporation in that case was undercapitalized with "a mere $100"); *Baatz v. Arrow Bar*, 452 N.W.2d 138, 142 (S.D. 1990) (refusing to find inadequate capitalization where corporation was started with only $5000, but the plaintiff had not carried burden to show why $5000 was inadequate); *Agway, Inc. v. Brooks*, 790 A.2d 438, 441 (Vt. 2001) (finding undercapitalization where corporate entity had "nothing of value"); 1 *Fletcher Cyclopedia of the Law of Corporations* § 41.33, Westlaw (database updated Sept. 2018) (a finding of inadequate capitalization is appropriate where the capital is "illusory or trifling" compared with the business to be done and the risks of loss).

¶ 59     In the context of undercapitalization, it is anomalous that the district court would have relied in part on the multi-tiered ownership structure of 1950 Logan in deciding to pierce the corporate veil.  As noted above, one of 1950 Logan's major institutional lenders insisted on this ownership structure.  Certainly the lender would not have done so if it believed that the

structure would result in undercapitalization and the inability of 1950 Logan to pay creditors — including that lender — during the useful life of the LLC. And there was no evidence that 1950 Logan failed to pay its known creditors before winding down its operations.

¶ 60 In its findings, the district court also referred to the lack of funds available for 1950 Logan to pay the judgment entered for Hinds. But the record shows that by the time that judgment had been entered, 1950 Logan had long before (indeed, years before) satisfied its single purpose — to develop the property and sell the units in the building — and had long since wound down operations. Undercapitalization is not determined by whether a single-purpose LLC might be able to pay liabilities that are incurred only after the LLC has reached the end of its useful life and has ceased operating.

### 6. Commingling of Assets, and Use of Corporate Funds for Noncorporate Purposes

¶ 61 The district court found that there was commingling of assets between Sedgwick and 1950 Logan and that corporate funds were used for noncorporate purposes. The only evidence the court relied on for this finding was the settlement of the HOA's construction defect lawsuit. The settlement was entered into jointly by Sedgwick,

1950 Logan, what the court called "Roman II and Roman III," and 1950 Logan Development. Though the court recognized that the joint settlement was, "to a certain extent[,] a drafting convenience," it said that the "funds actually came out of the only bank account which was in the name of 1950 Logan, LLC. And so at least some of those funds were paid to extinguish the liability, if any, of Sedgwick, among the other defendants." The court concluded, "1950 Logan's . . . funds [were] available to [Sedgwick] to settle its liability, if any," in the suit.

¶ 62 To the extent the court relied on this joint settlement, we have found no legal authority that would support a conclusion that such a joint settlement of potential liabilities is an indicator of alter ego status, and the parties have cited none. On the contrary, it is common knowledge among lawyers and judges that joint settlements that benefit unrelated parties often take place, especially where cross-claims among the settling entities may be anticipated.

¶ 63 The record does not support piercing 1950 Logan's corporate veil based on commingling of assets or the use of corporate funds for noncorporate purposes.

27

H. The Undisputed Evidence Fails to Establish Alter Ego Status and Therefore Precludes Veil-Piercing to Reach Assets of Sedgwick

¶ 64     We conclude that the evidence presented to the district court is insufficient to establish, even by a preponderance of the evidence, that 1950 Logan is the alter ego of Sedgwick. Therefore, the elements necessary for piercing the corporate veil cannot be met.

## III.    Conclusion

¶ 65     The district court's judgment against Sedgwick is reversed. We remand the case to the district court for entry of judgment for Sedgwick.

JUDGE GROVE concurs.

JUDGE J. JONES specially concurs.

28

J. JONES, J., specially concurring.

¶ 66     I agree with the majority's analysis of the alter ego question, and its result. But I write separately because I believe the district court's findings should lead to the conclusion that Mr. Hinds also failed to prove the second requirement for piercing the corporate veil — that the corporate form was "used to perpetrate a fraud or defeat a rightful claim." *In re Phillips*, 139 P.3d 639, 644 (Colo. 2006) (quoting *Contractors Heating & Supply Co. v. Scherb*, 163 Colo. 584, 588, 432 P.2d 237, 239 (1967)).

¶ 67     In *Martin v. Freeman*, 2012 COA 21, ¶ 21, a majority of a division of this court held that this requirement can be shown even if there was no wrongful conduct in the use of the corporate form. I dissented from that holding, and I continue to believe that the majority's holding is contrary to Colorado Supreme Court precedent. In my view, that precedent requires a showing that the corporate form was used "in a manner that, if not criminal, was at least unlawful or *intended* to defeat a claim." *Id.* at ¶ 33 (J. Jones, J., dissenting).

¶ 68     In this case, the district court found that "there was no evidence of fraud" and there was "no specific evidence of a wrongful

29

motive or intent." Absent any such evidence, there is no basis to conclude that 1950 Logan's corporate form was *used* to perpetrate a fraud or defeat a rightful claim. *See In re Phillips*, 139 P.3d at 644 ("Only when the corporate form was used to shield a dominant shareholder's improprieties may the veil be pierced."). So on this basis as well, the district court's judgment cannot stand.[1]

---

[1] Obviously, I do not fault the district court for relying on the majority's decision in *Martin*.