24CA0682 Love's Oven v Walters 07-17-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA0682
City and County of Denver District Court No. 22CV33347
Honorable Andrew J. Luxen, Judge

Love's Oven, LLC, a Colorado limited liability company,

Plaintiff-Appellant,

v.

Marc Walters a/k/a Marc Waltzer, and Richard Waltzer a/k/a Rich Walters,

Defendants-Appellees,

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE FOX
Harris and Schutz, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 17, 2025

Richards Carrington, LLC, Todd E. Mair, Michael N. Mulvania, Benjamin W. Hudgens, Denver, Colorado, for Plaintiff-Appellant

The Cross Law Firm, Dan S. Cross, Denver, Colorado, for Defendants-Appellees

¶ 1 After obtaining a judgment against Cloud 9 Confections, LLC (Cloud 9), Love's Oven, LLC (Love's Oven) brought a separate action to pierce Cloud 9's limited liability company (LLC) veil and hold Marc Walters, a/k/a Marc Waltzer, and Richard Waltzer, a/k/a Rich Walters, personally liable for the judgment.[1]  The district court declined to pierce the LLC veil, and Love's Oven appeals.  We affirm.

## I.    Background

¶ 2 Love's Oven is a licensed, Colorado-based manufacturer of edible marijuana-infused products.  Love's Oven sells its products to retailers (marijuana dispensaries) who then distribute the products to consumers.  It operates primarily as a family business.  Peggy Moore is the primary owner and CEO, and Joshua Nettles — Moore's son — is a partner.  Moore and Nettles met Marc in 2017 through a mutual friend.  At the time, Marc — who had been working in the food industry for several decades — had a concept for marijuana-infused gelato, so Marc and Nettles discussed a potential relationship in which Love's Oven would manufacture

---

[1] Given the circumstances surrounding their surnames, which we discuss below, for purposes of clarity we refer to the appellees by their first names, Marc and Rich.  We mean no disrespect in doing so.

Marc's gelato products. Ultimately, Love's Oven decided against a gelato product, but it was interested in a concept that Marc pitched for marijuana-infused chocolate.

¶ 3      At some point during the conversations with Love's Oven, Marc asked his brother, Rich, to help finance the potential business opportunity. Marc and Rich decided to form Cloud 9 to conduct business with Love's Oven. Cloud 9 was registered as a Colorado LLC on March 26, 2018. Rich was the LLC's sole member. Due to a divorce and past legal issues, Marc did not want his name on Cloud 9's founding documents. Marc's past also prompted him to petition to change his name from Marc Craig Waltzer to Marc Walters, which a Nevada court granted in September 2018, after Cloud 9's formation.

¶ 4      As to Cloud 9's operations, Rich and Marc agreed that, while the brothers occasionally "wore different hats," Marc was effectively Cloud 9's president. Marc held himself out to Love's Oven as Cloud 9's founder and president.

¶ 5      On April 30, 2018, Cloud 9 and Love's Oven entered into a licensing agreement (the Contract) that granted Love's Oven the right to use the intellectual property (IP) needed to create the

chocolate products, in exchange for royalty fees. Under the Contract — contingent on approval from Colorado's Marijuana Enforcement Division (MED) — Cloud 9 would provide Love's Oven with the IP, recipes, standard operating procedures (SOPs), ingredients, and all materials and information needed to develop the chocolate products. Love's Oven believed that Cloud 9 owned the IP, but the undisputed evidence showed that Marc owned the IP and "loaned" it to Cloud 9 via a verbal loan agreement.[2] Love's Oven did not manufacture chocolates when the parties' business relationship began, so Marc provided the recipes and SOPs and trained Love's Oven employees on how to manufacture the chocolates and how to use the necessary equipment. The Love's Oven facility also changed significantly to accommodate chocolate manufacturing.

---

[2] Marc and Rich emphasize language in the Contract that Cloud 9 "owns, or otherwise has the right to grant licenses with respect to the Licensed [IP]." However, Moore testified that Love's Oven believed Cloud 9 owned the IP and would not have "enter[ed] into an agreement with someone who did not own the rights to the [IP]." Therefore, even if Marc gave Cloud 9 the right to license the IP, Cloud 9 at worst misrepresented that it owned the IP and at best failed to inform Love's Oven that Marc was the true owner.

¶ 6     The parties performed under the Contract for several months, but in the spring of 2019, Moore became suspicious of Marc and Rich.  Love's Oven had been unsuccessfully pressing Cloud 9 to complete the MED paperwork.  Cloud 9's counsel at the time represented that Cloud 9 did not need to complete the MED application, which included a background check, but Moore testified that MED told her Cloud 9's application was required.  Moore suspected that Marc and Rich were stalling on the MED application to avoid the extensive background check process.  She then discovered that Rich's last name was Waltzer and suspected that Marc's last name was also Waltzer; her research revealed Marc's former last name and prior legal troubles.

¶ 7     Despite these concerns, Love's Oven continued to work with Cloud 9 until approximately September 2019 when Moore told Cloud 9 that Love's Oven would withhold royalty payments until Cloud 9 completed the MED application.[3]  In November 2019, Cloud 9 sued Love's Oven for, among other things, breaching the Contract

---

[3] Moore testified that Love's Oven continued to work with Cloud 9 in part because she was afraid to terminate the Contract in light of Marc's past and Cloud 9's prior threats to sue Love's Oven.

by withholding royalty payments. Love's Oven raised several counterclaims, including fraud. The case went to trial in 2020 but resulted in a mistrial. On November 1, 2021, the district court entered a stipulated judgment in which Cloud 9 agreed to the entry of a $500,000 judgment against it on Love's Oven's fraud counterclaim.

¶ 8 In November 2022, after Cloud 9 failed to satisfy the judgment, Love's Oven brought this action to pierce the LLC veil and hold Marc and Rich personally liable for the $500,000 judgment. The district court rejected the claim, and Love's Oven appeals.

¶ 9 On appeal, Love's Oven contends that the district court erred by holding that the first and third prongs in the three-part veil piercing inquiry were not satisfied. We affirm.

## II. Analysis

### A. Standard of Review and Applicable Law

¶ 10 Whether to pierce the corporate veil is "a mixed question of law and fact." *Stockdale v. Ellsworth*, 2017 CO 109, ¶ 17 (citation omitted). Under this standard, "[w]e defer to the trial court's findings of fact if they are supported by the record, but [we] review

the trial court's legal conclusions de novo." *Id.* (first alteration in original) (citation omitted). In other words, we review factual findings for clear error. *Sentinel Colo. v. Rodriguez*, 2023 COA 118, ¶ 18 ("A court's finding of fact is clearly erroneous if there is no support for it in the record.") (citation omitted) (*cert. granted in part* July 22, 2024). If a district court's legal conclusion is erroneous, we reverse only if the error was not harmless. *See* C.R.C.P. 61.

¶ 11     "A legal entity, such as an LLC, is separate from the members that own the entity." *Griffith v. SSC Pueblo Belmont Operating Co.*, 2016 CO 60M, ¶ 11. Therefore, the general rule is that "[n]either members nor managers of an LLC are personally liable for debts incurred by the LLC." *Id.* (alteration in original) (citation omitted). However, in "extraordinary circumstances," courts may "disregard[] the corporate entity" and impose personal liability by "pierc[ing] the corporate veil." *Id.* (citations omitted).

¶ 12     In the LLC context, we generally apply the same case law applicable to piercing a corporation's veil. *Id.* at ¶ 12 (citing § 7-80-107(1), C.R.S. 2024). We may "disregard the [LLC] shield" if: "(1) the entity is 'merely the alter ego' of the member, (2) the LLC

form is used to perpet[r]ate a wrong, and (3) disregarding the legal entity would achieve an equitable result." *Id.*

¶ 13  Under the first prong, the LLC is an alter ego of its members if the LLC "'is a mere instrumentality for the transaction of the [members]' own affairs, and there is such unity of interest in the ownership that the separate personalities of the [entity] and the owners no longer exist." *Id.* at ¶ 13 (citation omitted).  Colorado courts consider eight factors to determine whether an LLC is the alter ego of its members, which include whether

> (1) the [LLC] is operated as a distinct business entity, (2) funds and assets are commingled, (3) adequate [LLC] records are maintained, (4) the nature and form of the entity's ownership and control facilitate misuse by an insider, (5) the business is thinly capitalized, (6) the [LLC] is used as a 'mere shell,' (7) [members] disregard legal formalities, and (8) [LLC] funds or assets are used for noncorporate purposes.

*Stockdale*, ¶ 20 (citation omitted).

¶ 14  "[N]ot all of the listed factors need to be shown in order to establish alter ego status." *Sedgwick Props. Dev. Corp. v. Hinds*, 2019 COA 102, ¶ 32.  If the alter ego prong is satisfied, we next determine whether justice requires piercing the entity's veil

7

"because the [entity] fiction was used to perpetrate a fraud or defeat a rightful claim." *Stockdale*, ¶ 21 (citation omitted). Finally, if the first two prongs are satisfied, we "evaluate whether an equitable result will be achieved by disregarding the [entity] form" to hold a member personally liable for the entity's conduct. *Id.* at ¶ 22 (citation omitted). A claimant seeking to pierce the entity veil must prove each prong by a preponderance of the evidence.[4] *Sedgwick Props.*, ¶ 20.

## B. Alter Ego

¶ 15   Of the eight enumerated factors in the alter ego prong, the district court found that only one — whether "the nature and form of the entity's ownership and control facilitate misuse by an insider" — weighed in favor of an alter ego finding. *Stockdale,* ¶ 20 (citation omitted). It therefore concluded that Love's Oven did not prove that

---

[4] The Colorado Supreme Court has provided inconsistent guidance on whether the burden of proof is clear and convincing evidence or a preponderance of the evidence. *Compare Griffith v. SSC Pueblo Belmont Operating Co.*, 2016 CO 60M, ¶ 12 (preponderance), *with Stockdale v. Ellsworth*, 2017 CO 109, ¶ 23 (clear and convincing). We agree with a division of this court's conclusion that the "language from *Stockdale* was dictum, and . . . the burden of proof is by a preponderance of the evidence, as required by statute." *Sedgwick Props. Dev. Corp. v. Hinds*, 2019 COA 102, ¶ 20 (citing § 13-25-127(1), C.R.S. 2024).

Cloud 9 operated as Rich and Marc's alter ego. Love's Oven contends that all eight factors weigh in favor of an alter ego finding. Because there is record support for most of its findings and for its ultimate legal conclusion, we conclude that the district court did not err by finding that Cloud 9 was not Rich and Marc's alter ego.

¶ 16     While we consider each of the eight alter ego factors, our analysis differs slightly because Cloud 9 was a single-member LLC. *See Sedgwick Props.*, ¶ 36. For example, we generally give less weight to whether LLCs observe corporate formalities, particularly when the LLC has only one member. *Id.* at ¶¶ 34-36, 51 (citing § 7-80-107(1) to -(2), C.R.S. 2024).

### 1.     Distinct Business Entity

¶ 17     The district court concluded that Cloud 9 operated as a distinct business entity, *Stockdale*, ¶ 20, because "[i]t had the . . . trappings and formalities required by Colorado's LLC Act. It was registered with the Secretary of State. It had a bank account. It had . . . the other things that are required for LLCs in the state." We agree with Love's Oven that the court's reasoning could have been more robust, especially because there would be no basis upon which to pierce an LLC's veil if the LLC was not, at a minimum,

9

registered as an LLC.  However, we may "affirm on any ground supported by the record."  *Taylor v. Taylor*, 2016 COA 100, ¶ 31.

¶ 18     Cloud 9 was registered with the Secretary of State, had a bank account, produced some financial records, and Rich testified that it filed separate tax returns.  Moreover, it is undisputed that Cloud 9 provided beneficial services to Love's Oven.  Among other things, it trained Love's Oven employees, sourced ingredients, and developed recipes and SOPs for Love's Oven to follow.  And it operated this business through Cloud 9; invoices between Cloud 9 and various suppliers listed Cloud 9 as the payee, not Rich or Marc.

¶ 19     Love's Oven emphasizes Cloud 9's use of funds for personal expenses, but this evidence is more relevant to factors two and eight, which we next consider.  Because there was record support for the district court's determination that Cloud 9 operated as a distinct business entity, *see Sentinel Colo.*, ¶ 18, we agree that the first factor weighs against piercing the LLC veil.

### 2.     Commingling Funds and Using LLC Funds for Personal Purposes

¶ 20     Factors two and eight, whether LLC funds and assets were commingled and whether they were used for non-LLC purposes,

*Stockdale*, ¶ 20, rely on the same evidence. We therefore consider them together. The district court concluded that these factors weighed against an alter ego finding. Love's Oven presented evidence that (1) Rich used Cloud 9 funds — approximately $30,000 — to pay his credit card bill after Cloud 9 ceased its business operations, and (2) Cloud 9 paid the rent for an apartment Marc occupied for several months after Cloud 9 was no longer working with Love's Oven. With respect to the former, the district court noted that Rich paid his personal credit card bill after "the conclusion of Cloud [9's] business dealings." It also concluded that Cloud 9 paying Marc's rent did not support an alter ego finding because, although Marc was living in the apartment, he was also using it to pursue other business for Cloud 9. Love's Oven contends that both findings were in error. We agree, in part.

¶ 21    Cloud 9 produced various financial documents evidencing its income and expenses, including bank statements, a business ledger, and a summary of its transactions exceeding $1,000. From this evidence, Love's Oven identified the two instances of alleged commingling and/or use of company assets for personal expenses.

The timeline of those transactions compared to the parties' business relationship was as follows:

- April 30, 2018: The parties execute the Contract.

- July 2018: Marc starts working at Cloud 9. Cloud 9 starts paying Marc's rent for an apartment in Denver, categorizing the expense as "Office Rent."

- July through September 2019: Love's Oven notifies Cloud 9 that it will suspend royalty payments, the Contract is terminated, and — according to interrogatory responses introduced at trial — Marc stops working at Cloud 9.[5]

- September 2019: Rich closes Cloud 9's bank account with Centennial Bank, withdrawing $38,990.66. He then opens an account under Cloud 9's name with a different bank, depositing $30,000. The remaining $8,990.66 is unaccounted for.

- November 2019: Cloud 9 sues Love's Oven.

- March 2020: Cloud 9 stops paying Marc's rent.

---

[5] While the record is somewhat unclear with respect to the timeline of these events, the evidence shows that each event occurred between July and September 2019.

- March 2021: Rich withdraws the remaining balance, $29,770.78, from the Cloud 9 account and uses it to pay his personal credit card bill.

- November 2021: The court enters the stipulated $500,000 judgment against Cloud 9 in Denver District Court Case No. 19CV34549.

¶ 22    With respect to the more than $40,000 in rent that Cloud 9 paid for Marc's apartment, Marc and Rich both testified that Marc used the space to test products.  When asked about the office space rent expense, Rich initially suggested that "the rent would've been to cover [a] storage facility."  Later, he said that Cloud 9 paid Marc's rent because Marc used the kitchen to test products.  However, Cloud 9 continued to pay Marc's rent after the business relationship ended even though Cloud 9's only client and sole source of revenue was Love's Oven.  Marc testified that Cloud 9 continued to pay his rent because it was trying to get new business, and he had to make products to do that.  But interrogatory responses indicated that Marc stopped working at Cloud 9 in August 2019, and Rich testified that Cloud 9 ceased operations when it stopped doing business with Love's Oven.

¶ 23    Despite these inconsistencies, the district court was entitled to credit the evidence that Marc used the apartment for business purposes, even after the relationship with Love's Oven ended. And we defer to this finding because it had record support. *See Rodriguez*, ¶ 18; *In re Estate of Owens*, 2017 COA 53, ¶ 22 (noting that appellate courts defer to the district court's credibility findings).

¶ 24    As for the credit card payment, Rich testified that Cloud 9 had stopped operating and had paid its debts, and that he used the "leftover money in the account" to pay his personal credit card bill. The district court apparently found this explanation credible. However, the district court failed to consider that Cloud 9 was still engaged in litigation with Love's Oven when Rich used Cloud 9's funds to pay his credit card bill. *See Martin v. Freeman*, 2012 COA 21, ¶¶ 10, 16 (finding evidence of commingling where sale proceeds from the company's most significant asset went to the sole LLC member's personal account, and the member drained the LLC "of all assets during litigation, even though it was exposed to potential liability"). At that time, Cloud 9 presumably had legal expenses and, due to Love's Oven's counterclaims, potential liabilities. *Cf. id.*

at ¶¶ 35-37 (Jones, J., dissenting) (disagreeing in part because evidence supported finding that the sole LLC member did not engage in wrongful conduct, particularly where the sale of the asset occurred well before a counterclaim arose, and thus the creditor at the time of the sale was only a "*potential* creditor").

¶ 25     Cloud 9 did not close its account before litigation, or even before it was aware of Love's Oven's counterclaims. Rather, in the middle of ongoing litigation, Rich closed the account and used the money to pay his own credit card bill. Moreover, Cloud 9's financial records showed that it had used the Cloud 9 account to pay its legal fees. And there was no explanation for why it would stop doing so before litigation concluded. So, although Cloud 9's business dealings were complete, it still had litigation expenses and was exposed to potential liability when Rich drained the account.

¶ 26     We perceive no error in the district court's factual finding that Rich paid his credit card bill with Cloud 9 funds, but its legal conclusion was erroneous; divisions of this court have consistently held that diverting company assets for personal use is evidence that weighs in favor of finding that the company served as its member's alter ego. *E.g., id.* at ¶¶ 10, 16; *McCallum Fam. L.L.C. v. Winger,*

221 P.3d 69, 77 (Colo. App. 2009) (finding evidence of alter ego where the individual used company funds to pay his personal credit card bill). And at least one division of this court has concluded that doing so during ongoing litigation evinces improper use of business funds for personal expenses. *Martin*, ¶¶ 10, 16.

¶ 27    We therefore conclude that the eighth factor, whether "[LLC] funds or assets are used for noncorporate purposes," weighs in favor of an alter ego finding.[6] *Stockdale*, ¶ 20 (citation omitted). However, because the payment was a single transaction, and Cloud 9 generally kept its assets separate from Marc's and Rich's, we conclude that the district court could properly find that a single credit card payment did not evince improper commingling. *See McCallum Fam.*, 221 P.3d at 77 (commingling occurred where the individual routinely used company funds for personal expenses and

---

[6] We reject Cloud 9's suggestion that the $30,000 payment was "a final payment," an "immaterial amount," or "compensation." Our case law does not place a monetary limit on using entity funds for nonentity purposes, and the fact that Rich was never compensated for his work at Cloud 9 is not dispositive because there was no evidence that this payment was intended as compensation for his work. *See* § 7-80-606, C.R.S. 2024 (LLCs may make payments that "do not exceed amounts equal to or constituting reasonable compensation for present or past services").

16

occasionally "put some money back in"); *Martin*, ¶ 10 (commingling where the member used "personal assets to satisfy the entity's obligations" and also paid himself the proceeds from the entity's asset); *Tisch v. Tisch*, 2019 COA 41, ¶ 28 (commingling where it was "unclear which funds belonged to whom").

### 3.    Adequate Records

¶ 28    The district court found that, while Cloud 9 could have kept different or better records, it kept sufficiently detailed records to conclude that the third factor weighed against an alter ego finding. We perceive no clear error.  As discussed above, Cloud 9 produced various financial documents, meeting minutes, and hundreds of pages of invoices, purchase orders, and other documents pertaining to its business dealings.

¶ 29    Love's Oven contends that the bills and invoices were insufficient and that Cloud 9 did not create financial statements until the litigation began.  However, Love's Oven cites testimony explaining that Cloud 9's business ledger included transactions *through* December 31, 2019; the testimony does not indicate whether the ledger was prepared for litigation.  Love's Oven does not explain what records, if any, Cloud 9 failed to produce.  And

because Cloud 9 was a single-member LLC that only did business with one company, this factor arguably carries less weight. *See Sedgwick Props.*, ¶¶ 50-52 (single-member LLC's failure to observe certain formalities or keep certain records carries less weight in the alter ego analysis). Therefore, the district court did not err by concluding that the third factor weighed against an alter ego finding.

### 4. Entity's Form Facilitating Misuse

¶ 30 Based primarily on the evidence that Cloud 9 paid Marc's rent after the relationship with Love's Oven ended, the district court concluded that the apartment was used for business purposes but nevertheless found that the fourth factor, whether "the nature and form of the entity's ownership and control facilitate misuse by an insider," *Stockdale*, ¶ 20 (citation omitted), weighed in favor of "finding that Marc and Rich used Cloud [9] as an alter ego."

¶ 31 While the parties contest the weight attributable to this factor, they do not contest the district court's conclusion that the fourth factor weighed in favor of an alter ego finding. We also conclude that the record supports the district court's finding that "the nature and form of [Cloud 9's] ownership and control facilitate[d] misuse,"

18

which weighs in favor of an alter ego finding. *Stockdale*, ¶ 20 (citation omitted). Therefore, given the lack of dispute on this point and in light of the record support for the court's conclusion, we do not address this factor further.

## 5. Undercapitalization

¶ 32 The district court found that Cloud 9 was not thinly capitalized — even though its "exclusive source of revenues" was income from royalties paid by Love's Oven, and "the only thing [it] actually owned was the [IP]" — because the IP "worked and the products were successful and well-liked." Additionally, Rich testified that he spent "[i]n excess of $200,000" on Cloud 9, though neither Rich nor Marc provided any document to corroborate this number.

¶ 33 However, as discussed, it was undisputed that Cloud 9 did *not* own the IP — Marc merely "loaned" the IP to Cloud 9 — so we conclude that this finding lacks record support. Further, Rich testified that "Cloud 9 did not have any assets" at any point and that royalty payments from Love's Oven were its sole revenue source.

19

¶ 34    Yet, overall, we cannot determine from the record whether Cloud 9 was thinly capitalized because the evidence was insufficient to determine whether its capitalization at the time of formation was "very small in relation to the nature of the business . . . and the risks attendant to such businesses." 1 *Fletcher Cyclopedia of the Law of Corporations* § 41.33, Westlaw (database updated Sept. 2024). And while the district court erred by considering the IP as a Cloud 9 asset, even assuming Cloud 9 was undercapitalized, the district court's finding to the contrary was harmless, because, as discussed below, we conclude that the court correctly found that the factors as a whole weighed against finding that Cloud 9 operated as Rich or Marc's alter ego. *See* C.R.C.P. 61.

### 6.    Mere Shell

¶ 35    The district court next found that Cloud 9 was not a mere shell because it was created "for the purposes of operating the[] business relationship with Love's Oven" and because "it existed to protect two individuals from other legal liability." We agree with Love's Oven that creating an entity to shield individuals from liability does not weigh against an alter ego finding. *See Stockdale,* ¶ 11 (noting that the district court's alter ego finding was based

partly on evidence that the only way in which an individual "treated [the company] as a corporate entity, independent of him personally, is as a barrier to his personal liability"). But we conclude that the court's finding that Cloud 9 operated as a legitimate business had record support.

¶ 36    Cloud 9 was created in March 2018, just before contracting with Love's Oven in April 2018. Marc then began working with Love's Oven to develop products by training Love's Oven employees, sharing recipes, and generally providing Love's Oven with the resources needed to manufacture marijuana-infused chocolates. Nettles testified that Love's Oven did not make chocolates before working with Cloud 9 and, as of February 2024, chocolate represented roughly one-third of its business. And Moore agreed that Cloud 9 generally performed under the Contract. So, although Cloud 9 only had one customer, there was evidence in the record to support the district court's finding that Cloud 9 did not operate as a mere shell. *Cf.* Black's Law Dictionary 433 (12th ed. 2024) (defining shell company as "[a] corporation that has no active business and usu[ally] exists only in name as a vehicle for another company's business operations").

¶ 37 Love's Oven argues that Cloud 9 "was an empty shell" because Rich called the company a "conduit," and Cloud 9 did not own the IP, so it was effectively an empty conduit for Marc's IP. We are not persuaded. Whether Cloud 9 owned the IP is not dispositive. For example, a manufacturing business that leases its manufacturing equipment is not a shell company solely on this basis. The inquiry is whether the company was operating as a business, not whether it was using assets that it did not own. And while Rich called the company a conduit, he clarified that, in his view, this meant a business that provides services. A business that provides services is not a shell company. We conclude that the sixth factor weighs against finding that Cloud 9 operated as Marc and Rich's alter ego.

### 7. Disregarding Legal Formalities

¶ 38 Finally, the district court held that the seventh factor, whether LLC members "disregard legal formalities," weighed against an alter ego finding. When discussing the "adequate records" factor, the court recognized that an LLC's failure "to observe the formalities or requirements relating to the management of its business and affairs is not in itself a ground for imposing personal liability on the [LLC's] members." (Quoting § 7-80-107(2)). In considering the formalities

22

factor, the district court noted that Cloud 9 observed legal formalities "including registration with the Colorado Secretary of State, bank accounts, [and] other things."

¶ 39    We agree with Love's Oven that "the mere existence of a business entity" is insufficient to establish that the entity observed legal formalities.  However, the legal formalities factor carries significantly less weight in the LLC context.  *See* § 7-80-107(2); *Sedgwick Props.*, ¶¶ 34-36, 51-52.

¶ 40    Here, Love's Oven points to a lack of financial statements, Marc and Rich occupying different roles in different circumstances, "the use of fake names," disregarding MED regulations, and Cloud 9's use of LLC funds for Marc's rent and Rich's credit card bill.  We are not convinced that this evidence proves that Cloud 9 disregarded legal formalities to an extent that would weigh in favor of alter ego status.  Cloud 9 produced financial statements (even if it may have generated them for trial), and wearing "different hats" in a small company is not uncommon.  Even Nettles testified that "we all wear a lot of different hats" at Love's Oven.  Misrepresenting one's name is also not, in our view, evidence of disregarding legal formalities.  Next, Cloud 9's failure to complete the MED application

is not evidence that it failed to observe a business formality. Finally, we have considered Cloud 9's payment of Marc's rent and Rich's credit card bill above and conclude that such evidence goes more to the second and eighth factors than to whether Cloud 9 disregarded legal formalities.

¶ 41 Cloud 9 produced at least some evidence of legal formalities, including financial records, bank accounts specific to the LLC, and records of annual meeting minutes. And while Love's Oven suggests that Cloud 9 manufactured its financial records and meeting minutes for trial, it is not our role to weigh the reliability or credibility of this evidence. *See In re Estate of Owens,* ¶ 22. Giving this factor minimal weight, we conclude that the seventh factor weighs against, or is at least neutral to, an alter ego finding. *See Sedgwick Props.,* ¶¶ 34-36, 51-52.

### 8. Conclusion

¶ 42 Unlike the district court, we conclude that more than one factor weighs in favor of concluding that Cloud 9 served as Marc and Rich's alter ego. However, because at most three of the eight factors support an alter ego finding, we hold that the district court did not err by concluding that the factors weighed against finding

that Cloud 9 served as Marc and Rich's alter ego.[7]  As a result, we need not address the remaining fraud and equity prongs of the veil-piercing analysis.

## III.    Disposition

¶ 43     The judgment in favor of Marc and Rich and against Love's Oven is affirmed.

JUDGE HARRIS and JUDGE SCHUTZ concur.

---

[7] Even if we omit the "legal formalities" factor entirely, the factors weighing in favor of an alter ego finding are still in the minority (three out of seven).  *See Sedgwick Props.*, ¶ 36 (suggesting that the legal formalities factor may not apply to single-member LLCs).