The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader.  The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
April 16, 2020

**2020COA69**

**No. 18CA1716, *Dill v. Rembrandt Group, Inc.*— Corporations —
Piercing the Corporate Veil — Horizontal Piercing**

As a matter of first impression, a division of the court of
appeals concludes that Colorado corporate law permits horizontal
veil piercing between entities that do not share direct common
ownership, but that share common ownership through another
entity.  However, horizontal piercing may only occur if the veil of
each corporate entity and its owners is first pierced.  Because that
did not occur here, we reverse the court's judgment finding that
defendant Rembrandt Group, Inc., and intervenor Pikes Peak
Acquisitions, LLC are alter egos.  The division further concludes
that the record does not support the district court's finding that the
corporate form was used to defeat a rightful claim.  Finally, the
division concludes that Pikes Peak Acquisitions and Rembrandt

Group are entitled to reasonable costs and appellate attorney fees under the "Intercreditor and Subordination Agreement." Therefore, the district court's judgment in favor of the plaintiff is reversed and the case is remanded for further proceedings.

COLORADO COURT OF APPEALS                    **2020COA69**

Court of Appeals No. 18CA1716
City and County of Denver District Court Nos. 15CV34604 & 16CV30289
Honorable Michael J. Vallejos, Judge

Ernest R. Dill and Julie D. Dill,

Plaintiffs-Appellees,

v.

Rembrandt Group, Inc., a Colorado corporation,

Defendant-Appellant,

and

Pikes Peak Acquisitions, LLC, a Colorado limited liability company, and Suvi Hejbol Miller, as personal representative of the Estate of Robert D. Arnold,

Intervenors-Appellants.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division VI
Opinion by JUDGE FREYRE
Richman and Grove, JJ., concur

Announced April 16, 2020

Miller & Law, P.C., Curtis R. Henry, Jonathan R. Slie, Littleton, Colorado, for Plaintiffs-Appellees

Holland & Hart LLP, Sean M. Hanlon, Denver, Colorado, for Defendant-Appellant

Mulliken Weiner Berg & Jolivet P.C., Murray I. Weiner, Colorado Springs, Colorado, for Intervenors-Appellants

¶ 1     This appeal by defendant Rembrandt Group, Inc. (RGI), a Colorado corporation, and intervenor Pikes Peak Acquisitions, LLC (PPA), a Colorado single-member limited liability company (LLC), requires us to determine whether a court may find that two entities that neither are in a parent-subsidiary relationship nor have any ownership interest in each other, but share common owners through another LLC, can be alter egos.

¶ 2     RGI owes money to PPA, its current senior creditor, and to plaintiff Ernest R. Dill, a subordinate creditor.  PPA is wholly owned by Intellitec Executives, LLC (Intellitec), which is not a party to this case.  Intellitec, in turn, is owned by five individuals.  The same five individuals also own 81.25 percent of RGI's stock (the five common owners).  Mr. Dill filed suit against RGI to collect on his subordinate indebtedness after learning that Rocky Mountain Mezzanine Fund II, L.P. (RMMF), the original senior creditor, had assigned RGI's indebtedness to PPA.  Mr. Dill argued that, because RGI and PPA (indirectly via Intellitec) shared common owners, they are alter egos of each other.  Mr. Dill reasoned that the senior indebtedness was extinguished when RMMF assigned RGI's debt to PPA for a discounted amount, which allowed RGI, through PPA, to effectively

1

acquire a debt payable to itself. Thus, under Mr. Dill's argument, he can collect on his subordinated debt. The trial court agreed.

¶ 3    We conclude that RGI and PPA are not alter egos of each other because they are separate legal entities that lack common ownership or control and do not otherwise satisfy the alter ego factors. Further, because the trial court failed to find that (1) RGI is the alter ego of five of its twelve owners; (2) Intellitec is the alter ego of its owners (the same five common owners, who also own 81.25 percent of RGI's stock); and (3) Intellitec and PPA are alter egos of each other, it could not use "horizontal" veil piercing to find that RGI and PPA are alter egos of each other.

¶ 4    We further conclude that the record does not support the court's finding that PPA acquired RGI's indebtedness for the purpose of defeating Mr. Dill's rightful claim. Therefore, the court erred by holding that RGI and PPA are alter egos and, thus, that the senior indebtedness was extinguished when PPA acquired it. We reverse the judgment.

I.    Factual Background

¶ 5    Mr. Dill sold several trade schools to RGI in 2000. RGI financed the purchase (and acquired working capital) by borrowing

2

$3.69 million from RMMF, as evidenced by a note (RMMF note) payable to RMMF, and by Mr. Dill's agreement to carry back $3 million of the purchase price. The RMMF note was and remains assignable.

¶ 6     As a condition of providing financing for RGI's purchase, RMMF required Mr. Dill to execute an "Intercreditor and Subordination Agreement" (IC agreement). As relevant here, the IC agreement designated Mr. Dill the subordinate creditor and his debt the subordinated indebtedness, and it designated RMMF the senior creditor and the RMMF note the senior debt. As well, it authorized RMMF to issue a payment blockage notice to suspend RGI's payments to Mr. Dill under any notes payable to him if RGI defaulted on the senior indebtedness. Such blockage would remain effective until RGI satisfied the senior indebtedness.

¶ 7     The IC agreement also expressly precluded Mr. Dill from commencing any legal action against RGI to collect on any notes payable to him "unless and until all of the Senior Indebtedness has been fully paid and satisfied."

¶ 8     Importantly, the IC agreement allowed RMMF to assign the RMMF note to any third party without notice to or consent from Mr.

Dill.  As pertinent here, the IC agreement provided that "if any third party satisfies the Senior Indebtedness owing to Senior Lender, Senior Lender may assign its rights and remedies hereunder to such third party, and such third party shall be deemed to be Senior Lender for all purposes of this Agreement."

¶ 9    The IC agreement does not define "third party."

¶ 10    In 2008, RGI defaulted on its obligations to Mr. Dill.  As part of a settlement with Mr. Dill, RGI executed two new promissory notes payable to Mr. Dill (Dill notes).  These notes are secured by a stock pledge agreement whereby RGI pledged one hundred percent of the schools' outstanding stock Mr. Dill had originally sold to RGI.  At that time, Mr. Dill reaffirmed the IC agreement.  The Dill notes and stock pledge agreement are the focus of this litigation.

¶ 11    In 2011, the five common owners (who collectively own 81.25 percent of RGI) formed Intellitec.  In 2012, Intellitec's owners (five common owners) formed PPA, with Intellitec as its single member.  Using a portion of life insurance proceeds from one of Intellitec's deceased members, in April 2012, PPA purchased the RMMF note (which, at the time, had an unpaid balance of $3 million owed to

4

RMMF) for the discounted price of $1.5 million.[1]  RMMF assigned

its rights under the RMMF note and the IC agreement to PPA.  At

the time of trial, PPA's assets included the RMMF note, some cash,

and several shares of RGI stock.[2]  Figure 1 illustrates the corporate

structures and the relationships between Mr. Dill, RGI, and PPA.



Figure 1

---

[1] PPA eventually assigned twenty percent of the RMMF note to the personal representative of the deceased member's estate, Suvi Hejbol Miller.  PPA and Miller are both intervenors in this case.  For simplicity, we refer to them jointly as PPA.  Because the trial court did not rely on this finding, however, we do not further consider it.
[2] RGI acknowledges in its brief that PPA owns some shares of RGI obtained as consideration for giving RGI extensions to make payments on the RMMF note.   Because the trial court did not rely on this fact, and neither party raised it on appeal, we do not consider it.

¶ 12     After making $274,586 in payments to PPA under the RMMF note, RGI defaulted on the RMMF note in August 2012. The default did not initially affect Mr. Dill, as RGI paid him nearly $1.1 million under the Dill notes through April 2015.

¶ 13     In May 2015, RGI exercised its right to defer payment under the Dill notes for twelve months due to its "verifiable financial difficulties."[3] In August 2015, PPA and RGI entered into a forbearance agreement under which PPA agreed to "forbear and forgo interest and principal payments" so that RGI could sell some of its trade schools to reduce its total indebtedness. Then, on October 1, 2015, pursuant to the IC agreement, PPA issued a payment blockage notice to Mr. Dill prohibiting him, as the subordinate creditor, from receiving further payments on the Dill notes until the senior debt has been fully satisfied.

## II.    Procedural Background

¶ 14     On December 30, 2015, Mr. Dill sued RGI for breach of the Dill notes, breach of the stock pledge agreement, unjust enrichment, breach of a lease agreement, and attorney fees. His

---

[3] Mr. Dill disputed at trial that RGI properly invoked this provision. Because the trial court did not address this issue, neither do we.

6

complaint alleged that RMMF's assignment of the RMMF note to PPA in 2012 extinguished the senior debt because the members of PPA's owner (Intellitec) own 81.25 percent of RGI. Thus, he reasoned, PPA and RGI are alter egos and RGI had essentially purchased its own debt through PPA.

¶ 15    On February 29, 2016, PPA filed a complaint for injunctive relief in a separate proceeding, arguing that RMMF's assignment of the RMMF note to PPA was valid. PPA sought a preliminary injunction barring Mr. Dill from prosecuting his case against RGI because the IC agreement precludes it. Mr. Dill countered that, because RGI and PPA are alter egos, they "basically owe[d] money to themselves." The court consolidated the two cases and set a hearing on PPA's motion for preliminary injunction.

¶ 16    After the hearing, the court denied PPA's motion for a preliminary injunction, ruling that it was unclear "whether PPA has a reasonable probability of success on the merits." The trial court found that success on the merits would depend in part on whether RGI and PPA are alter egos.

¶ 17    After a bench trial a year later, RGI and PPA moved to dismiss Mr. Dill's claims under C.R.C.P. 41(b). The trial court dismissed the

breach of lease and unjust enrichment claims.  On November 3,

2017, the trial court issued a detailed written order setting forth the

pertinent issue:

> There is no dispute that RGI has not made
> payment and is in "default" of the RMM[F] note
> and of the two [Dill notes].  There is no doubt
> that the Dills[4] were junior lenders to [RMMF].
> Also, there is no dispute that the RMM[F] note
> was assigned to PPA.  Again, the question at
> issue has been whether there was a valid
> assignment or, instead, whether there was
> actually a satisfaction of the debt.  If PPA is
> simply an alter ego of RGI who is trying to
> avoid their obligations under the note, then the
> assignment was not valid, and the Dills may
> enforce their rights under the agreements.  If
> PPA is not an alter ego of RGI, and the
> assignment was valid, then, PPA, by
> assignment, became the senior lender, and the
> Dills, pursuant to the [IC agreement], may not
> bring a lawsuit to enforce their rights.

¶ 18    Applying the three-part test for veil piercing set forth in

*McCallum Family L.L.C. v. Winger*, 221 P.3d 69 (Colo. App. 2009),

the court first found that RGI and PPA are alter egos.  In reaching

---

[4] Mr. Dill's complaint also listed his wife, Julie D. Dill, as a plaintiff, although she was not a party to the Dill notes or the stock pledge agreement.  Although RGI argues that the judgment in favor of Mrs. Dill should be vacated because she was not a party to the Dill notes or the stock pledge agreement, we need not address this issue because we reverse on other grounds.

this conclusion, the court found that (1) PPA is a single-purpose LLC that operates as a distinct business entity; (2) PPA's assets consist of the RMMF note, cash, and several shares of RGI stock; (3) PPA and RGI do not commingle funds; (4) PPA maintains adequate business records; (5) no evidence of misuse of the corporate form existed; (6) PPA followed all legal formalities; (7) PPA was formed for the sole purpose of acquiring the RMMF note; and (8) five of RGI's shareholders formed Intellitec, which, in turn, formed PPA.

¶ 19     Next, the court found no evidence of fraud, relying on the undisputed evidence that RGI made regular payments to Mr. Dill even after defaulting on the RMMF note in 2012. Instead, it found that PPA is a "shell corporation," formed by Intellitec for the purpose of avoiding creditors, including Mr. Dill. It also reasoned that PPA's decision to execute the forbearance agreement in 2015 so as "not to crush RGI" showed that PPA "indulged RGI's default" in a manner "to which other creditors were unlikely to consent." It noted that, if the deceased common owner's personal representative had used the life insurance proceeds to allow RGI to pay RMMF directly, this would have represented a satisfaction of the debt, and Mr. Dill would have become the senior creditor under the IC

agreement.[5]  Instead, the members of Intellitec, who also are shareholders of RGI, formed PPA, funded PPA with the life insurance proceeds to purchase the RMMF note, and thereby defeated Mr. Dill's rightful claim to collect on the Dill notes.

¶ 20    Finally, the trial court found that piercing the corporate veil would yield an equitable result by extinguishing the senior indebtedness and allowing Mr. Dill to obtain what he had bargained for.

¶ 21    RGI and PPA appealed the court's ruling.  The first appeal was dismissed without prejudice for lack of finality.  The trial court then clarified that, having found that RGI was in default under the Dill notes, RGI had also breached the stock pledge agreement.  The court also clarified that Intellitec is not a party to this litigation and that it had only found RGI and PPA (and not PPA and Intellitec) to be alter egos.  RGI and PPA now appeal the final judgment.

---

[5] The trial court did not make findings explaining how a $1.5 million payment could have satisfied the $3 million debt.  Because the parties have not raised this discrepancy and the trial court did not consider it, neither do we.

### III.  Horizontal Veil Piercing

¶ 22     RGI and PPA contend that the trial court erroneously pierced the corporate veil to find that RGI's indebtedness to PPA was extinguished when RMMF assigned the RMMF note to PPA.  They argue that veil piercing cannot apply "horizontally" to two separate entities not in a parent-subsidiary relationship that share no common owners, an unresolved question in Colorado.  Alternatively, they argue that if horizontal piercing applies, it may occur only if the veils separating each entity and a common parent or owner in the ownership chain are first pierced by establishing that each entity and its owner are alter egos.[6]

¶ 23     We hold that horizontal veil piercing may occur between entities that do not share direct common owners, but that indirectly share common owners through another entity in an ownership chain.  However, the veils between the separate entities and their owners in the ownership chain must first be pierced.  Because

---

[6] In addition to establishing that the entities are alter egos, a plaintiff must also establish the other two elements of veil piercing: whether the corporate form was used to commit a fraud or defeat a rightful claim, and whether equitable results will be achieved by disregarding the corporate form. *McCallum Family L.L.C. v. Winger*, 221 P.3d 69, 74 (Colo. App. 2009).

nothing in the record shows that RGI is the alter ego of the five common owners, that Intellitec is the alter ego of the five common owners, or that PPA and Intellitec are alter egos of each other, the court erred by finding that RGI and PPA are alter egos of each other and, consequently, that RGI's senior indebtedness was extinguished. Accordingly, we reverse the court's judgment.

## A. Preservation

¶ 24 Mr. Dill disputes preservation of this issue. To preserve an issue for appeal, all that is necessary is that the issue "be brought to the attention of the trial court and that the court be given an opportunity to rule on it." *Berra v. Springer & Steinberg, P.C.*, 251 P.3d 567, 570 (Colo. App. 2010).

¶ 25 Although neither RGI nor PPA explicitly used the term "horizontal veil piercing" in the trial court, PPA's trial brief argued that "RGI and PPA have similar, but not identical, ownership" and that PPA was "operated as a distinct business entity." Moreover, PPA argued in its Rule 41(b) motion that, to the extent any "commonality of ownership" existed, it was not between RGI and PPA, but between RGI and Intellitec. And RGI joined PPA in its closing argument before submitting its own Rule 41(b) motion.

12

Under these circumstances, we conclude that PPA and RGI sufficiently preserved for our review "the sum and substance of the argument [they] now make[] on appeal." *Berra*, 251 P.3d at 570.

B.     Standard of Review and Applicable Law

¶ 26     We review de novo a trial court's legal conclusions in finding an alter ego and in piercing the corporate veil, and we examine its related factual findings for clear error. *Sedgwick Props. Dev. Corp. v. Hinds*, 2019 COA 102, ¶ 22. We defer to the trial court's factual findings and disturb them only when they are not supported by the record. *Amos v. Aspen Alps 123, LLC*, 2012 CO 46, ¶ 25.

¶ 27     An LLC is a legal entity separate from the members who own it. *Griffith v. SSC Pueblo Belmont Operating Co.*, 2016 CO 60M, ¶ 11; *Sedgwick*, ¶¶ 15-17. Thus, neither the members of an LLC nor its managers are personally liable for debts incurred by the LLC. § 7-80-705, C.R.S. 2019; *Griffith*, ¶ 11. Indeed, the corporate veil fiction "isolates 'the actions, profits, and debts of the corporation from the individuals who invest in and run the entity[,]' [and] [o]nly extraordinary circumstances justify disregarding the corporate entity to impose personal liability." *Sedgwick*, ¶ 15 (quoting *In re Phillips*, 139 P.3d 639, 643 (Colo. 2006)).

¶ 28    To pierce the corporate veil in Colorado, a court must conduct a three-part inquiry. *Id.* at ¶ 21. First, it must determine whether the corporate entity is the alter ego of the person or entity in issue. *Id.* An alter ego relationship exists when a corporation or LLC is merely an instrumentality for the transaction of the shareholders' or members' affairs and "there is such unity of interest in ownership that the separate personalities of the corporation [or LLC] and the owners no longer exist." *In re Phillips*, 139 P.3d at 644 (quoting *Krystkowiak v. W.O. Brisben Co.*, 90 P.3d 859, 867 n.7 (Colo. 2004)).

¶ 29    To determine whether unity of interest exists, a court considers several factors, including whether (1) the corporation or LLC operates as a distinct business entity; (2) the two entities commingle funds and assets; (3) the two entities maintain inadequate corporate records; (4) the nature and form of the entities' ownership and control facilitates misuse by an insider; (5) the corporation or LLC is "used as a 'mere shell'"; (6) "the business [i]s thinly capitalized"; (7) legal formalities are disregarded; and (8) corporate funds or assets are used for noncorporate purposes. *Id.* (quoting *Leonard v. McMorris*, 63 P.3d 323, 330 (Colo. 2003));

*Sedgwick*, ¶ 32. Courts examine the specific facts of the case and need not find the existence of every factor to find an alter ego. *Great Neck Plaza, L.P. v. Le Peep Rests., LLC*, 37 P.3d 485, 490 (Colo. App. 2001).

¶ 30 Second, upon finding that an entity is the alter ego of its owners, a court must determine whether the corporate fiction was used to perpetrate a fraud or defeat a rightful claim. *Sedgwick*, ¶ 21.

¶ 31 Third, a court must consider whether disregarding the corporate form would achieve an equitable result. *Id.* If it finds that the moving party has satisfied this three-part test by a preponderance of the evidence, then it may disregard the corporate identity and impute liability. *Griffith*, ¶ 14; *Sedgwick*, ¶ 21.

### C. Horizontal Veil Piercing in Colorado

¶ 32 RGI and PPA assert that the trial court erred by piercing the corporate veil because RGI and PPA have no parent-subsidiary relationship and do not exercise control over each other. The trial court found that, at the time RMMF assigned the RMMF note to PPA, neither RGI nor PPA possessed any ownership interest in the other, nor did either entity control the other. Rather, the five

common owners, who controlled 81.25 percent of RGI's shares, were also the founders and only members of Intellitec, the LLC that wholly owned PPA.

¶ 33 Entities that share common shareholders, owners, or parents are sister companies. Black's Law Dictionary 418 (10th ed. 2014) (defining sister corporation as "[o]ne of two or more corporations controlled by the same, or substantially the same, owners"); *see also Minno v. Pro-Fab, Inc.*, 905 N.E.2d 613, 617 (Ohio 2009). RGI and PPA are therefore sister entities because the five common owners who own 81.25 percent of RGI also own the LLC that, in turn, owns PPA. Mr. Dill does not cite, nor have we found, any Colorado case that extends piercing the corporate veil horizontally to sister companies.

¶ 34 Some jurisdictions categorically bar piercing the corporate veil between entities that are not in vertical, or parent-subsidiary, relationships. *See Minno*, 905 N.E.2d at 617 (holding that "a plaintiff cannot pierce the corporate veil of one corporation to reach its sister corporation" because the "lack of ability of one corporation to control the conduct of its sister corporation precludes application of the piercing-the-corporate-veil doctrine"); *see also Madison Cty.*

*Commc'ns Dist. v. CenturyLink, Inc.*, No. CV 12-J-1768-NE, 2012 WL 6685672, at *4 (N.D. Ala. Dec. 20, 2012) (horizontal veil piercing cannot occur because "[s]ister corporations do not benefit from the corporate form of their siblings" and because, without evidence of ownership interest, complete domination and control necessary for the alter ego element cannot be established); *Kiesel Co. v. J & B Props., Inc.*, 241 S.W.3d 868, 872 (Mo. Ct. App. 2008) (piercing the corporate veil doctrine "generally serves to reach shareholders, not horizontal affiliates, in cases involving fraud"). Unlike Colorado, these jurisdictions typically do not recognize reverse veil piercing.[7]

¶ 35    In jurisdictions where horizontal piercing is recognized, a plaintiff seeking to disregard the corporate formalities separating horizontal affiliates must first pierce the veils separating each entity

---

[7] The Colorado Supreme Court has held that Colorado law allows a corporate outsider to press an action against a corporate insider and subject corporate assets to such a claim by disregarding the corporate entity through reverse veil piercing. *In re Phillips*, 139 P.3d 639, 645 (Colo. 2006). "Reverse piercing occurs when a claimant seeks to hold a corporation liable for the obligations of an individual shareholder." *Id.* at 644. The court explained that the same three-factor test used in traditional veil piercing also applies to reverse veil piercing. *Id.* at 646. This is the opposite of traditional veil piercing, which "imposes liability on individual shareholders for the obligations of the corporation." *Id.* at 644.

from their shared corporate parent. *Capmark Fin. Grp. Inc. v. Goldman Sachs Credit Partners L.P.*, 491 B.R. 335, 349 (S.D.N.Y. 2013); *Outokumpu Eng'g Enters., Inc. v. Kvaerner EnviroPower, Inc.*, 685 A.2d 724, 729 (Del. Super. Ct. 1996) (refusing to pierce the veil between sister entities for personal jurisdiction without first piercing the veils to the common parent); *see also Huntsville Aviation Corp. v. Ford*, 577 So. 2d 1281, 1287-88 (Ala. 1991) (a sister corporation could be held liable for the debts and obligations of a corporation owned by the same parent because the parent used the corporations "interchangeably"). Except for Alabama, these jurisdictions typically recognize reverse veil piercing.

¶ 36    But even in jurisdictions that do not explicitly recognize reverse veil piercing, horizontal piercing between sister entities can still occur when the veil piercing elements are satisfied. *See Tower Inv'rs, LLC v. 111 E. Chestnut Consultants, Inc.*, 864 N.E.2d 927, 941 (Ill. App. Ct. 2007) (courts may also pierce the corporate veil between two affiliated, or "sister," corporations when there is such unity of interest and ownership between the corporations that separate personalities between the corporations no longer exist, and adherence to the fiction of separate personalities would promote

injustice or inequitable circumstances); *see also Greenspan v. LADT, LLC*, 121 Cal. Rptr. 3d 118, 138 (Ct. App. 2010) ("Generally, alter ego liability is reserved for the parent-subsidiary relationship. However, under the single-enterprise rule, liability can be found between sister companies." (quoting *Las Palmas Assocs. v. Las Palmas Ctr. Assocs.*, 1 Cal. Rptr. 2d 301, 318 (Ct. App. 1991))).[8]

¶ 37    Because our supreme court has not explicitly barred horizontal piercing to find that sister entities are alter egos, and it recognizes the doctrine of reverse veil piercing, *see In re Phillips*, 139 P.3d at 645, we reject RGI and PPA's contention that Colorado courts may *never* pierce the veil to reach sister entities.  *See McCallum Family L.L.C.*, 221 P.3d at 75 ("'[T]he mere existence or nonexistence of formal stock ownership is not necessarily conclusive' in determining whether the corporate veil may be pierced." (quoting William M. Fletcher, *Cyclopedia of Corporations* § 41.10, at 141 (2006))); *see also Nursing Home Consultants, Inc. v. Quantum Health Servs., Inc.*, 926 F. Supp. 835, 840 n.12 (E.D. Ark.

---

[8] Colorado courts have not recognized the single-enterprise rule, nor have the parties raised it on appeal.  Therefore, we do not consider it.

1996) ("horizontal" or "triangular" veil piercing "results from a sequential application of the traditional piercing doctrine and the 'reverse piercing' doctrine"), *aff'd*, 112 F.3d 513 (8th Cir. 1997). Indeed, another division of this court held an individual, who was not a shareholder, officer, or director, but who had some beneficial interest in a corporation, liable for the debts and obligations of the corporation over which he exercised dominion and control through its owners. *McCallum Family L.L.C.*, 221 P.3d at 75; *see also* Cathy S. Krendl & James R. Krendl, *Piercing the Corporate Veil: Focusing the Inquiry*, 55 Denv. L.J. 1, 24 (1978).

¶ 38     However, we agree with RGI and PPA that horizontal veil piercing between sister entities may occur only if (1) the entities share a parent or common owners in the ownership chain and (2) the veils separating each entity from the parent or common owners are first pierced to find that each sister entity is the alter ego of its owners.

¶ 39     Recently, a division of this court considered circumstances involving piercing the veil between related entities. *Sedgwick*, ¶ 45. In *Sedgwick*, the plaintiff sought to pierce the veil between a single-member, single-purpose LLC (1950 Logan) and its manager

(Sedgwick, another LLC).  *Id.* at ¶ 16.  The division concluded that the trial court erred in finding that Sedgwick and 1950 Logan were alter egos in part because the court had failed to first find that Sedgwick was the alter ego of its principal, Paris, an individual who also controlled 1950 Logan through other business entities.  *Id.* at ¶ 45.

¶ 40    We therefore conclude that Colorado corporate law permits horizontal veil piercing, under the traditional veil piercing test, between entities that share common ownership through another entity, but only if the veil of each corporate entity is also pierced.

### D.    Alter Ego Analysis

¶ 41    In order to reach the conclusion that RGI and PPA are alter egos, three prerequisites would need to be satisfied.  First, the veil separating RGI from the five common owners would need to be pierced to hold the five common owners liable for RGI's actions.  Next, the veil separating the five common owners and Intellitec would need to be pierced to hold Intellitec liable for the actions of the five common owners.  And finally, the veil separating Intellitec and PPA would need to be pierced to hold PPA liable for the

obligations of Intellitec.  *See Capmark Fin. Grp. Inc.*, 491 B.R. at 349.

¶ 42    Mr. Dill failed to present any evidence to support the multiple piercings required to disregard the separate corporate identities of RGI and PPA.  *See id.*  Nothing in the record shows that (1) RGI is the alter ego of the five common owners; (2) RGI's corporate fiction was used to perpetrate a fraud or defeat a rightful claim; or (3) piercing the veil would achieve an equitable result.  *See Sedgwick*, ¶ 21.

¶ 43    To be sure, the trial court found that the owners of Intellitec also collectively own 81.25 percent of RGI, but it is well settled that ownership alone is not a basis to find alter ego.  *See Indus. Comm'n v. Lavach*, 165 Colo. 433, 437, 439 P.2d 359, 361 (1968) ("Even where all the stock is owned by a sole shareholder, there seems no adequate reason to depart from the general rule that the corporation and its shareholders are to be treated as distinct legal persons." (quoting *Box v. Roberts*, 112 Colo. 234, 238, 148 P.2d 810, 812 (1944))); *McCallum Family L.L.C.*, 221 P.3d at 75 ("the mere existence or nonexistence of formal stock ownership is not necessarily conclusive" in determining whether the corporate veil

may be pierced (quoting Fletcher, § 41.10)).  Moreover, no record evidence exists or even suggests that the five common owners exercise dominion and control over RGI to transact their own affairs or for any unlawful purpose.  *McCallum Family L.L.C.*, 221 P.3d at 75.

¶ 44    As well, no record evidence supports the other alter ego factors, such as whether RGI is undercapitalized, fails to follow corporate formalities, commingles assets with the five common owners, or operates as a "mere shell."  Because the record does not support a finding that RGI and the five common owners, who also owned Intellitec, are alter egos, the corporate veil separating those owners and RGI cannot be pierced.  And if the veil between RGI and the five common owners cannot be pierced, then RGI and PPA cannot be alter egos.  We explain why next.

¶ 45    No one disputes that PPA is a single-member LLC and is *not* owned by the five common owners.  Therefore, neither RGI nor PPA owns the other, and the only means of piercing the veil between them is to show that the five common owners exercise dominion and control over PPA via Intellitec.  *See id.* at 77 ("When an individual demonstrates great dominion and control over a

23

corporation, and especially over corporate assets, the lack of such a formal role or title [such as a shareholder, director, or officer] will not necessarily impede a finding of personal liability for corporate activities.").

¶ 46 Nothing in the record shows that Intellitec and its owners are alter egos, or that the owners formed Intellitec for a fraudulent purpose or to defeat a rightful claim. And, in a subsequent order, the trial court clarified that it had not found Intellitec was an alter ego of either RGI or PPA. Absent this finding, PPA cannot be the alter ego of the five common owners and, thus, PPA and RGI cannot be alter egos.

¶ 47 Mr. Dill's factual allegations with respect to PPA, Intellitec, and the Intellitec ownership chain merely point to benign actions typical of parent-subsidiary relationships. Assuming, as Mr. Dill alleges, that Intellitec created PPA solely to hold the RMMF note, single-asset, single-member LLCs are permitted and may be formed for any lawful business purpose. § 7-80-103, C.R.S. 2019 (an LLC may be formed for any lawful business); § 7-80-204(1)(g), C.R.S. 2019 (requiring the articles of organization of an LLC to have at least one member); *see also Sedgwick*, ¶ 17. Nothing in the record shows

that Intellitec formed PPA for an unlawful purpose, or that Intellitec has misused PPA's corporate form. *See In re Phillips*, 139 P.3d at 644 (holding claimant must prove the corporate structure was used to perpetrate a wrong).

¶ 48 Moreover, while the record shows that one of the common owners managed PPA for a period of time, this fact alone also cannot support veil piercing. *See Sedgwick*, ¶ 49 (a managing LLC did not exercise ownership and control over the LLC it managed under contract); *see also United States v. Friedland*, 173 F. Supp. 2d 1077, 1092 (D. Colo. 2001) (overlapping directors and officers is insufficient to warrant piercing the veil); *Sumner Realty Co. v. Willcott*, 499 N.E.2d 554, 557 (Ill. App. Ct. 1986) ("The separate corporate entities of two corporations may not be disregarded merely because one owns the stock of the other or because the two share common officers . . . ."). While common officers and directors may be a prerequisite to piercing the corporate veil, commonality of officers and directors is a regular business practice that exists in most parent-subsidiary relationships. *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 381 (7th Cir. 2008).

¶ 49    Because the record lacks any evidence to show that RGI is the alter ego of the five common owners, that the five common owners are the alter ego of Intellitec, or that Intellitec and PPA are alter egos of each other, the trial court erred by piercing the veils of RGI and PPA to find they are alter egos.  Accordingly, we reverse the judgment.

IV.    Perpetrate a Fraud or Defeat a Rightful Claim Analysis

¶ 50    Even if RGI and PPA are alter egos, we would nevertheless conclude that insufficient evidence supports the court's finding that PPA was formed to defeat Mr. Dill's rightful claim.

¶ 51    "The mere fact that corporate creditors would go unsatisfied because they cannot reach a shareholder's personal assets does not, alone, justify piercing the corporate veil." *McCallum Family L.L.C.*, 221 P.3d at 78.  Nor is piercing the corporate veil justified "simply because a parent company receives a financial benefit from its subsidiaries." *Griffith*, ¶ 15.  As one leading treatise on the law of corporations summarizes, "[a]lthough wrongdoing by a parent corporation need not amount to plain fraud or illegality, the injured party must show some connection between its injury and the parent's improper manner of doing business."  1 *Fletcher Cyclopedia*

26

*of the Law of Corporations* § 43, Westlaw (database updated Sept. 2019); *see also McCallum Family L.L.C.*, 221 P.3d at 78 ("[T]he creditor seeking to pierce the veil must show an *effect* on its lawful rights as a creditor resulting from abuse of the corporate form."); *Guptill Holding Corp. v. State*, 307 N.Y.S.2d 970, 973 (App. Div. 1970) (using "control to commit the wrong complained of . . . and . . . an injury proximately caused by said wrong" are required to pierce the corporate veil); Krendl & Krendl, 55 Denv. L.J. at 27-28 ("[T]here must be some reasonable relationship between the injury suffered by the plaintiff and the actions of the defendant. . . . [N]o plaintiff may avoid corporate limited liability unless he can prove injury resulting from misuse of the corporation . . . ."). "Thus, a party seeking to pierce the corporate veil must show that the financial setup of the corporation is a sham and causes an injustice." *Scott v. AZL Res., Inc.*, 753 P.2d 897, 901 (N.M. 1988).

¶ 52 We begin by noting that RMMF assigned its note and its rights under the IC agreement to PPA in April 2012. Although Mr. Dill complains that he was unaware of this assignment, he acknowledges that he was not entitled to notice of the assignment under the IC agreement, nor has he articulated any harm resulting

from PPA's acquisition of the RMMF note.  Moreover, he points to no evidence to indicate that this transaction was anything other than a lawful business transaction.  And nothing in the record shows that the assignment was intended to defeat Mr. Dill's claim against RGI on the Dill notes.

¶ 53      The record, additionally, shows that, following this assignment, RGI continued to pay both PPA and Mr. Dill.  Indeed, the court construed the continuing payments to Mr. Dill as evidence that neither RGI nor PPA had engaged in fraud or wrongdoing.  And even when RGI defaulted on its payments to PPA in 2012, PPA allowed RGI to continue paying Mr. Dill until 2015, rather than immediately issuing a blockage notice under the IC agreement that would have ceased payments to him.  It also allowed RGI to reduce its total indebtedness, a benefit to both creditors.  *Cf. McCallum Family L.L.C.*, 221 P.3d at 79 (concluding the corporate form defeated a rightful claim where evidence showed the defendant left no funds in the corporation to satisfy the debt owed to plaintiff and demonstrated that profits should have been applied to business operations but were instead out of plaintiff's reach).

¶ 54    The trial court relied primarily on the fact that the five common owners own Intellitec and 81.25 percent of RGI, and on its conclusion that Intellitec formed PPA to defeat Mr. Dill's rightful claim to repayment of the Dill notes. But it never explained how this corporate structure defeated Mr. Dill's claim or harmed him, nor did it cite to any evidence that PPA was formed to avoid creditors. As previously noted, commonality of ownership, without more, is insufficient to pierce the corporate veil. *See id.* at 75.

¶ 55    None of the parties assert that it would have been improper for a third party that did not have common owners with RGI to have purchased the note from RMMF and to have taken actions identical to those taken by PPA. To the contrary, the court acknowledged in its order denying the preliminary injunction that "if [RMMF] were still the senior creditor, or if persons unrelated to RGI received the assignment, this litigation would not exist." However, the harm (or lack thereof) in the trial court's scenario is no different than that which exists here. Absent some evidence showing that transferring the RMMF note to PPA harmed Mr. Dill, Mr. Dill cannot show that the corporate fiction was used to a defeat a rightful claim. *See id.* at 78.

29

¶ 56    Moreover, the record contains no evidence that RGI's and PPA's conduct contravened the IC agreement. The trial court acknowledged that, although the ownership structure between RGI and PPA *could* facilitate misuse, PPA's issuance of the payment blockage notice was consistent with the IC agreement, which Mr. Dill had negotiated and signed with the assistance of counsel in 2000. And that agreement permitted RMMF to freely assign its note and to transfer senior creditor status to a third party, including the right to issue payment blockage notices and to bar Mr. Dill from bringing an action to collect his debt until the senior creditor's debt was satisfied. Mr. Dill reaffirmed these terms when he settled RGI's first default, and he testified that he understood the IC agreement's terms.

¶ 57    The trial court never found that PPA breached the IC agreement, and the record shows that Mr. Dill actually benefited from PPA's flexible conduct — namely, through PPA's decision not to issue a payment blockage notice in 2012 — because it enabled Mr. Dill to receive payments from RGI between 2012 and 2015 in excess of $1 million. Far from defeating a rightful claim, PPA's conduct enabled RGI to continue paying Mr. Dill.

¶ 58    Consequently, in the absence of evidence that PPA's purchase of the RMMF note harmed Mr. Dill, we conclude that the record does not support the court's finding that PPA was formed to defeat a rightful claim.

## V.    Remaining Contentions

¶ 59    Because we reverse the court's alter ego and rightful claim findings, we need not address RGI's or PPA's remaining contentions about the admissibility of the Dill notes or about the scope and application of section 7-80-107(1), C.R.S. 2019.  We also need not address RGI's contention that the trial court erred by entering judgment in favor of Mrs. Dill on the breach of the Dill notes and breach of stock pledge agreement claims, because Mrs. Dill was not a party to either.

## VI.    Appellate Attorney Fees

¶ 60    RGI and PPA request appellate attorney fees and costs, as the prevailing parties, pursuant to section 17 of the IC agreement and C.A.R. 39.1.  As relevant here, the IC agreement provides as follows:

> Costs and Attorney Fees.  If there is any claim or controversy litigated in any lawsuit between any of the parties hereto in connection with [the IC agreement], the prevailing parties in the lawsuit shall be entitled to recover from the

other parties their reasonable costs and attorneys' fees.

¶ 61    Because we reverse the judgment, we conclude that RGI and PPA are the prevailing parties under section 17 and award them reasonable fees and costs under C.A.R. 39.1. Accordingly, we remand the case to the trial court to determine and award reasonable appellate attorney fees and costs.

## VII.    Conclusion

¶ 62    The judgment is reversed, and the case is remanded for entry of judgment in favor of RGI and PPA and the computation and award of reasonable attorney fees and costs.

JUDGE RICHMAN and JUDGE GROVE concur.