24CA2072 Marriage of Pittman 10-30-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA2072
Douglas County District Court No. 23DR30656
Honorable Andrew C. Baum, Judge

---

In re the Marriage of

Taylor J. Pittman,

Appellee,

and

Christina D. Pittman n/k/a Christina L. DeMichelis,

Appellant.

---

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division II
Opinion by JUDGE FOX
Meirink and Hawthorne*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 30, 2025

---

The W Law, Emily Warren, Jon Eric Stuebner, Denver, Colorado, for Appellee

Christina D. Pittman n/k/a Christina L. DeMichelis, Pro Se

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1    The district court dissolved the marriage of Taylor J. Pittman (father) and Christina D. Pittman n/k/a Christina L. DeMichelis (mother), and it entered permanent orders (1) allocating parenting time and decision-making; (2) dividing the marital property; (3) ordering father to pay future maintenance and child support (but denying retroactive awards); (4) allowing the parties to file an amended joint tax return; and (5) declining to award mother's unpaid attorney fees. Mother appeals various aspects of the court's permanent orders. We affirm except as to the portion of the court's order allowing father to offset his child support obligations against various debts mother owed him.

## I.    Background

¶ 2    The parties were married in 2019 and had two daughters, G.P. (born in 2020) and L.P. (born in 2022). Father petitioned for dissolution of marriage in August 2023. Mother was represented by counsel from August 2023 until June 2024, at which point she proceeded pro se. A permanent orders hearing occurred on September 23 and 24, 2024. The district court issued the dissolution decree after the hearing. It then issued written permanent orders on October 18, 2024, and amended written

permanent orders on January 16, 2025. We address mother's challenges to the permanent orders below.

## II. Educational Decision-Making

¶ 3 Mother first contends that the district court erred by depriving her of the right to make appropriate educational decisions for the children and contends that the district court violated her due process rights by restricting her ability to object and present evidence. We discern no error.

### A. Relevant Facts

¶ 4 The parties' children were both under five years old when the court issued permanent orders. G.P. was diagnosed with autism spectrum disorder (ASD), and her condition requires specialized behavioral care, occupational therapy, and speech therapy. During the dissolution proceeding, mother assumed much of G.P.'s and L.P.'s care in the marital home(s).

¶ 5 At the permanent orders hearing, the district court made findings concerning decision-making and parenting time.[1] It

---

[1] Consistent with the recommendations of the child and family investigator, the court allocated parenting time in phases, and father's parenting time increased with each phase. The court also detailed a process and timelines for the parents' communication.

acknowledged that G.P.'s ASD required her to have additional support services. It also recognized that both parents fully supported all aspects of G.P.'s therapy and that the parents and G.P.'s therapy providers jointly agreed to focus on that therapy, rather than placing G.P. in school for the 2024-2025 school year.

¶ 6 Guided by section 14-10-124(1.5)(a) and (b), C.R.S. 2025, the district court addressed the applicable factors before allocating joint decision-making to both parents for "all major issues including health and medical care, orthodontics, mental health, education, religion, and extracurricular activities." However, when the children were in the care of a particular parent, that parent could make day-to-day or routine decisions about the children.

¶ 7 As relevant to mother's appeal, the court's January 16, 2025, amended permanent orders acknowledged mother's request that the children attend private school. It also noted father's concerns about the financial burdens associated with a private school setting. While the court did not prohibit a private school option indefinitely, it concluded that until both parties had paid the marital and separate debt allocated to them, a private school option was not feasible. The court also set a target date of twenty-four

months to pay off the debt (excluding mother's student loan debt) so that the parents could then revisit a private school option.

## B. Legal Principles

¶ 8 The district court has broad discretion over the allocation of parental decision-making responsibilities. *In re Marriage of Morgan*, 2018 COA 116M, ¶ 23. We will not disturb the court's decision absent a showing that the court acted in a manner that was manifestly arbitrary, unreasonable, or unfair, or that misapplied the law. *In re Marriage of Pawelec*, 2024 COA 107, ¶ 45. And we will uphold the court's decision when the evidence supports it. *In re Marriage of Hatton*, 160 P.3d 326, 330 (Colo. App. 2007); *see Van Gundy v. Van Gundy*, 2012 COA 194, ¶ 12 (reviewing factual findings for clear error).

¶ 9 Section 14-10-130(1), C.R.S. 2025, provides that "*the person or persons with responsibility for decision-making* may determine the child's upbringing, including his or her education." (Emphasis added.) Where joint decision-making is allocated, both parents are "persons with responsibility for decision-making [who] may determine the child's . . . education." *Id.* But when those parents cannot responsibly discharge their duty to make a particular

4

decision, a court is sometimes left with no alternative but to do so. *In re Marriage of Thomas*, 2021 COA 123, ¶¶ 36-38.

## C.    Discussion

¶ 10    Mother argues that the district court erred by tying the children's educational options to the parents' debt repayment. She disagrees with the court's decision about where the children will be educated. But the court's findings enjoy record support, so we cannot disturb them. *See Hatton*, 160 P.3d at 330; *see also In re Parental Responsibilities Concerning S.Z.S.*, 2022 COA 105, ¶ 28 (recognizing that we may not reweigh the court's resolution of conflicting evidence).

¶ 11    Mother testified that she wanted both children to attend private school. She elaborated on the resources available at Compositive Primary, a private school. Father countered that his main objection to private school was that he and mother lack the funds to pay $20,000 annually per child — or $40,000 for both children — to attend private school. He also relied on the fact that, in anticipation of the 2025-2026 school year, G.P. had an individualized education plan to address her specific needs, which a public school had to abide by, while the private school could choose

to send G.P. home for behavioral issues. *See* 34 C.F.R. § 300.137(a) (2024) ("No parentally-placed private school child with a disability has an individual right to receive some or all of the special education and related services that the child would receive if enrolled in a public school."). Moreover, father testified about the family's debt, including their unsuccessful attempts to manage that debt. Even with the generous tuition assistance mother now invokes, citing the child and family investigator's report, this family was simply in no position to incur the added expense of private school tuition for either child. Mother's own brief acknowledges that the parties' debt exceeds $177,000. The debt included credit card debt, tax liability, and mother's student loan balance (and excluded loans from family members and attorney fee debt for both parties).

¶ 12    *Thomas* is instructive here. There, a division of this court recognized that when the parents "reach[] an impasse in making a major decision they [are] obligated to make together," the district court has the authority to break "a parental deadlock between joint decision-makers." *Thomas*, ¶¶ 36, 38; *see also In re Marriage of Dauwe*, 148 P.3d 282, 285 (Colo. App. 2006) (upholding an order

6

granting the mother the authority to obtain therapy for the children because it resolved a longstanding dispute).

¶ 13    Seeing no reason to depart from the holding in *Thomas*, we reject mother's contention that the district court erred by not allowing her to dictate where the children attend school when both parents could not agree.  Notably, the court did not foreclose the parents' ability to revisit the private school issue after they paid their considerable debt (marital and separate but excluding mother's student loan debt).  The prospective component of the court's order is not challenged here, so we need not address it.  *See Compos v. People*, 2021 CO 19, ¶ 35 (noting that under the party presentation principle, parties "are responsible for advancing the facts and arguments entitling them to relief" (quoting *Greenlaw v. United States*, 554 U.S. 237, 243-44 (2008))).

¶ 14    To the extent mother raises other challenges to the court's decision regarding the children's education, she does not show how the federal education laws she references conflict with or displace Colorado law concerning families and children.  *See, e.g.*, § 14-10-104.5, C.R.S. 2025; *see also Special Sch. Dist. No. 1, Minneapolis Pub. Schs. v. R.M.M.*, 861 F.3d 769, 775 (8th Cir. 2017) (federal law

"limits the obligations a state owes to disabled children enrolled in private schools"). On appeal she now offers other options the district court should have considered, but she did not present all those options to the district court. *See Bertoia v. Galaxy Mgmt. Co.,* 2025 COA 55, ¶ 40 (new arguments may not be raised for the first time on appeal).

¶ 15    Regarding her claim that she was not afforded due process, regrettably many Colorado families do not have the benefit of two days' worth of the court's time. The court generously afforded this family a two-day permanent orders hearing, perhaps in part to accommodate mother's pro se status.[2] Under the circumstances — and absent an offer of proof during the hearing about what evidence mother proffered and was not allowed to present — we cannot conclude that she was deprived of due process in any way. *See Galiant Homes, LLC v. Herlik,* 2025 COA 3, ¶¶ 50-66.

¶ 16    Each side had equal time, and in the time that remained, the court invited mother to present anything else she wished the court

---

[2] While the court gave mother leeway, it was ultimately her responsibility to follow the court's rules at the district level and on appeal. *See Yadon v. Southward,* 64 P.3d 909, 912 (Colo. App. 2002) (pro se parties must adhere to the court rules).

to consider. She chose to use her remaining time to argue that she should have been awarded funds to hire counsel and that father should be ordered to pay her unpaid attorney fees (the balance due before her attorney withdrew). She offered no other exhibits or testimony. *See id.* at ¶¶ 65-66.

¶ 17    All told, mother and father reached an impasse in making a major decision they were obligated to make together — how to educate their children. Because they could not resolve the dispute, the district court appropriately exercised its authority to do so. *See Thomas*, ¶¶ 36-38. We therefore discern no error.

### III.    Child Support and Maintenance

¶ 18    Mother next contends that the court erred in its child support and maintenance determinations because it (1) failed to impute to father all income he earned; (2) improperly imputed income to her; (3) omitted child care expenses; (4) granted father a $583 monthly credit for extraordinary expenses; (5) offset various debts against father's child support and maintenance obligations; (6) denied her retroactive maintenance and child support; and (7) ordered the parties to file joint tax returns. We largely disagree with her

contentions but conclude that the court erred by allowing father to offset his child support obligation against debts mother owed him.

### A.    Relevant Facts

¶ 19    Following a two-hour temporary orders hearing, the district court ordered father, on a temporary basis, to pay mother $3,530 monthly in child support and $3,625 monthly in maintenance for a total of $7,155 each month (paid in weekly installments).  Later, based on the evidence presented at the two-day permanent orders hearing, the court observed that mother and father lived well beyond their means during the marriage and now face a "crushing mountain of debt."

¶ 20    To meet his temporary obligation, father added two jobs to his regular job.  At the permanent orders hearing, father testified that he did not plan to continue working three jobs.  Father's primary full-time job grossed $13,212 per month.  Mother disclosed that she earned $1,222 per month from part-time work (twelve to sixteen hours per week).  Both parties referenced their monthly expenses and debt.

B.    Standard of Review

¶ 21    We review maintenance and child support orders for an abuse of discretion because "the issue of the [parties'] financial resources is factual in nature," but we review de novo whether the trial court applied the correct legal standard to its factual findings. *In re Marriage of Davis*, 252 P.3d 530, 533 (Colo. App. 2011); *see also In re Marriage of Wells*, 252 P.3d 1212, 1213 (Colo. App. 2011) (child support); *In re Marriage of Medeiros*, 2023 COA 42M, ¶ 28 (maintenance).

¶ 22    Whether a party is "voluntarily underemployed" presents a mixed legal and factual question under section 14-10-114(8)(c)(IV), C.R.S. 2025. *People in Interest of J.R.T. v. Martinez*, 70 P.3d 474, 476-77 (Colo. 2003). We defer to the district court's factual findings if they are supported by the record and review its legal conclusions de novo. *In re Marriage of Garrett*, 2018 COA 154, ¶ 9.

C.    Legal Principles

1.    Calculating Maintenance and Child Support

¶ 23    The court addresses maintenance after dividing the marital assets and debt. *See In re Marriage of Morton*, 2016 COA 1, ¶ 31; *see also* § 14-10-113(1), C.R.S. 2025. Section 14-10-114(3) details

11

the process a trial court must follow when considering a maintenance request. *In re Marriage of Wright*, 2020 COA 11, ¶ 13. The court must first make findings concerning (1) the amount of each party's gross income; (2) the marital property distributed to each party; (3) each party's financial resources; (4) the reasonable financial need established during the marriage; and (5) whether the maintenance award would be deductible for federal income tax purposes. § 14-10-114(3)(a)(I); *see Wright*, ¶ 14.

¶ 24     After making these initial findings, the court must determine "the amount and term of the maintenance award, if any, that is fair and equitable to both parties." § 14-10-114(3)(a)(II); *Wright*, ¶ 15. The court need not make explicit factual findings about each factor in section 14-10-114(3)(c), which governs the amount and duration of maintenance, as long as the record shows that it meaningfully considered the factors and it provides us with a clear understanding of the basis for its decision. *Wright*, ¶ 20.

¶ 25     "After calculating the maintenance award, the court may determine child support obligations." *In re Marriage of de Koning*, 2016 CO 2, ¶ 22. To determine the amount of a child support award, the court must consider several factors, including — as

relevant here — both parents' financial resources.  § 14-10-115(2)(b), C.R.S. 2025.

### 2. Determination of Parties' Income

¶ 26    The district court generally determines child support and maintenance based on the parties' gross incomes.  § 14-10-114(3)(a)(I)(A), (8)(c) (maintenance); § 14-10-115(5)(a)(I) (child support).  "Gross income" means income from any source and includes potential income for a party who the court finds is voluntarily underemployed.  § 14-10-114(8)(c)(I), (IV); § 14-10-115(3)(c), (5)(a)(I), (5)(b)(I).  However, gross income does not include "[i]ncome from additional jobs that result in . . . employment of . . . more than forty hours per week or more than what would otherwise be considered to be full-time employment."  § 14-10-114(8)(c)(II)(C); § 14-10-115(5)(a)(II)(C).

¶ 27    If a parent is voluntarily unemployed or underemployed, the court must calculate child support and maintenance based on the parent's potential, not actual, income.[3]  § 14-10-114(8)(c)(IV); § 14-

---

[3] "Potential income" is "the amount a party could earn from a full-time job commensurate with the party's demonstrated earning ability."  *In re Marriage of Tooker*, 2019 COA 83, ¶ 26

10-115(5)(b)(I). A party is voluntarily underemployed if the court finds they are "unreasonably for[]going higher paying employment that [they] could obtain." *Martinez*, 70 P.3d at 476.

### D. Analysis

#### 1. Parties' Income

¶ 28 The court awarded the marital home (Cedar Circle) and an Infinity vehicle to mother. The home had $65,000 in net equity, and the car was valued at $15,000. The court also allocated $28,900 in credit card debt to mother. The court awarded father his retirement accounts, a Volvo vehicle, and significant debt. It valued the retirement accounts at $52,000, the Volvo at $4,000, and the debt at approximately $75,500.

¶ 29 After explaining that it was applying the operative statute and cases, the court made the following factual findings:

- Father's gross monthly income for maintenance purposes was $13,212 based on his full-time employment at TJX. The court acknowledged that it could not factor additional jobs into the calculation.

- Mother's monthly income was $1,222 based on part-time work of twelve to sixteen hours per week. The court

14

declined to find that mother was voluntarily underemployed, noting that she was enrolled in an Executive Masters program in Health Administration. It also refused to impute the $68,000 per year she earned before the children were born.

- Recognizing that it could only credit father for uninsured extraordinary medical expenses of over $250 per child per year, the court accepted that father's out-of-pocket medical insurance expenses were $7,000 annually or $583 monthly ($7,500 in actual expenses less $250 per child).

- Based on its calculations, the court concluded that father owed mother $896 per month in child support. Starting November 1, 2024, it ordered father to make two equal monthly payments into the Family Support Registry.

¶ 30    Applying the statutory maintenance factors, the court also awarded mother $3,414 per month in maintenance for fourteen months. In making this award, the court acknowledged that father would need to work more than forty hours per week for the duration

of maintenance to meet the obligation.[4]  The court also recognized that, with a graduate degree, mother should be able to increase her earning potential (beyond what she had earned in the past).

¶ 31    Mother argues that the district court improperly imputed $1,222 of monthly income to her, despite her enrollment in a graduate program and her caretaking responsibilities, which included caring for a child with a disability.  But she does not appear to fault the court's finding that she was not voluntarily underemployed.  Because she was not underemployed, the court was required to consider her actual gross income, not her potential income.  § 14-10-114(3)(a)(I)(A), (8)(a)(II), (8)(c)(IV); § 14-10-115(3)(c), (5)(a), (5)(b)(I).  And because mother's actual monthly income was $1,222, this was the proper calculation.  Accordingly, we reject her contention that the court improperly imputed income to her.

¶ 32    Mother also contends that the district court erred by failing to consider father's multiple jobs, mistakenly limiting its calculation of

---

[4] Father has not cross-appealed the district court's orders, so we do not address this component of the order.  *See Koinis v. Colo. Dep't of Pub. Safety*, 97 P.3d 193, 197 (Colo. App. 2003) (recognizing that an appellee "must file a cross-appeal in order to raise a contention that, if successful, would increase its rights under the judgment or order being reviewed").

his income to one full-time job. She contends that this affected the maintenance award. But the maintenance statute explicitly instructs courts, when determining a party's gross income, not to consider "[i]ncome from additional jobs that result in" work beyond forty hours per week or that is greater than full-time employment. § 14-10-114(8)(c)(II)(C). Therefore, the district court could not consider father's additional income in its maintenance calculations. *See* § 14-10-115(5)(a)(II)(C) (same for child support).

## 2. Child Care Expenses

¶ 33    Mother contends that the district court erred by failing to include child care expenses in its child support calculations. As relevant to mother's challenge on appeal, she testified that the parties hired a nanny for the children. While the child support mother received following temporary orders included the nanny expenses, mother did not testify or produce evidence at the permanent orders hearing about the amount of those expenses. Father contends that this issue is unpreserved because mother failed to present evidence of child care expenses at the permanent orders hearing, but she requested child care expenses in the parties' joint trial management certificate and in a proposed child

support worksheet. While she may not have proved her entitlement to those expenses, she directed the court's attention to the matter such that it had an opportunity to rule on the issue. *Dill v. Rembrandt Grp., Inc.*, 2020 COA 69, ¶ 24.

¶ 34 Father testified that until June 2023, he worked remotely full time and mostly watched the children during the day with occasional help from the nanny.[5] Mother, who was afflicted with postpartum depression, would mostly be in her bedroom. At some point, the maternal grandparents provided child care, so father could be more attentive to work.

¶ 35 While it would not have been unreasonable for the court to include some amount of child care expenses in a child support award, it was mother's burden to prove the amount she historically paid and anticipated needing. *See In re Marriage of Connerton*, 260 P.3d 62, 67 (Colo. App. 2010) (District courts "may only consider child care expenses that were actually incurred."); *see* § 14-10-

---

[5] Father also challenged the reasonableness of any claimed child care expenses. According to him (1) mother only claimed she was working eight hours per week; (2) her parents provided a significant amount of free child care; and (3) mother's educational program only required her to be at the school one weekend per semester with all other instruction provided online.

115(9)(a) ("Net child care costs incurred on behalf of the children

. . . shall be added to the basic obligation . . . ."). There was

evidence that mother was enrolled in online classes and presumably

could not attend to the children then. But mother also testified

that her parents provided child care during her classes, and she did

not testify that she paid her parents for that child care. *See W.

Denv. Feed Co. v. Ireland*, 551 P.2d 1091, 1094 (Colo. App. 1976)

(even if no direct evidence contradicts a witness's testimony, the

trier of fact need not accept the testimony as establishing the truth

of facts to which it is directed).

¶ 36    To the extent mother's brief relies on the worksheets she

supplied, she does not point to exhibits or testimony substantiating

the expenses she claimed. Given the evidence presented at the

permanent orders hearing, we cannot conclude that the district

court abused its wide discretion by not including child care

expenses as part of the child support award to mother. *See

Connerton*, 260 P.3d at 67 (concluding that the district court did not

err by declining to include "child care expenses . . . that were

speculative and not actually incurred").

### 3.    Extraordinary Medical Expenses

¶ 37    In addition, mother avers that the court erred in crediting father $583 for the children's monthly extraordinary medical expenses in its child support order.  *See* § 14-10-115(10)(h)(II), C.R.S. 2024 (authorizing child support credits for annual uninsured medical expenses above $250 per child).[6]  Father's testimony addressed his request for these expenses, and mother did not cross-examine him regarding this request.  Indeed she testified that she wanted father to "take on" the children's health insurance and made a similar request in the trial management certificate.  And the court's medical expenses credit was directly tied to the children's health insurance costs.

¶ 38    Because mother did not indicate to the court that she objected to father's receiving the monthly credit, we will not review this contention of error.  *Credit Serv. Co. v. Skivington,* 2020 COA 60M, ¶ 22 ("[W]e don't consider issues raised for the first time on appeal.").  We also decline mother's invitation to review the issue for plain error.  Unlike in criminal cases, no rule requires plain error

---

[6] The statute no longer includes a $250 limit.  § 14-10-115(10)(h)(II), C.R.S. 2025.

review in civil cases. *In re E.R.S.*, 2019 COA 40, ¶ 35. We review unpreserved arguments for plain error "only in the rare civil case, involving unusual or special circumstances — and even then, only when necessary to avert unequivocal and manifest injustice." *Id.* (citation modified). Because this is not one of those rare cases, we do not review mother's unpreserved argument.

### 4. Offsets Against Child Support and Maintenance

¶ 39 Mother next argues that the district court erred by allowing father to offset certain expenses against his child support and maintenance obligations. We agree in part. The court included the following in the written permanent orders:

- It awarded a vehicle to father and ordered mother to pay father $8,453 for insurance payments she received related to the vehicle. If she did not transfer that amount by a specific date, the court allowed father to offset his child support and maintenance payments against the amount mother owed.

- It ordered father to pay a joint tax debt in full and offset mother's half ($2,671) against father's maintenance payments. If that offset was insufficient to cover

mother's half after her fourteen-month maintenance terminated, father could then offset any remaining balance from his child support obligation.

- It awarded Cedar Circle to mother, ordered her to refinance all encumbrances to her name only within six months, and ordered father to continue paying the various encumbrances on the house until mother refinanced or sold the home, which he could offset against his maintenance obligation.

- It categorized certain litigation costs as "non-marital debt" but allocated the costs equally between the parties, ordering father to offset mother's half of the costs ($7,997.50) against his child support and maintenance obligations.

¶ 40    In post-trial motions, mother argued that father could not offset his maintenance obligation against the tax liability and that it

was generally improper to offset this obligation against other debts.[7] We conclude that the court erred by allowing father to offset debt against his child support obligation. However, any claimed error with respect to the offsets against his maintenance obligation was harmless. *See* C.R.C.P. 61.

¶ 41    The court could not properly offset father's child support obligation against other debts because child support is "for the care of the child" and is a right belonging exclusively to the child. *In Interest of Baby A*, 2015 CO 72, ¶ 40. "Therefore, the support must go to the children's daily care and cannot be used for expenditures made for the parent." *Id.*; *see also Hall v. Hall-Stradley*, 776 P.2d 1166, 1167 (Colo. App. 1989) ("[A] parent who owes a duty of child support may not offset that obligation against a personal judgment that parent may have against the custodial parent."). And although "a setoff against arrearages may be appropriate if . . . no harm will result to the interests of the children," *In re Marriage of Wisdom*,

---

[7] The parties agree that this issue is preserved, but mother did not supplement the record with her post-trial filings raising the issue. *See McLellan v. Colo. Dep't of Hum. Servs.*, 2022 COA 7, ¶ 27 (appellants must designate the appellate record). However, we may take judicial notice of records in related proceedings. *Harriman v. Cabela's Inc.*, 2016 COA 43, ¶ 64; CRE 201.

833 P.2d 884, 887 (Colo. App. 1992), an order regarding arrearages is not the same as an initial support order, *see In re Marriage of Drexler*, 2013 COA 43, ¶ 23 (distinguishing a principle applicable to an initial obligation from principles applicable when a party defaults on their support obligations). We therefore reverse the portion of the court's order allowing father to offset the above costs against his child support obligation.

¶ 42    However, even if the court improperly offset costs against father's maintenance obligation, any error was harmless. *See* C.R.C.P. 61. First, with respect to Cedar Circle, the court determined that father could only offset costs for Cedar Circle's encumbrances until mother transferred the home and encumbrances to her name, and it acknowledged that father's payments would reduce mother's monthly need. Therefore, the offset aligned with the maintenance statute's purpose of ensuring a fair and equitable award, "based upon the totality of the circumstances" by applying "all relevant factors, including . . . the recipient spouse['s] [ability] to meet . . . her needs." § 14-10-114(3)(c)(I), (3)(e). Additionally, because father conveyed Cedar Circle to mother in November 2024, which he was only required to

do after she refinanced, the record suggests that this offset applied for (at most) one month.

¶ 43     Next, with respect to the $8,453 in insurance proceeds, any offset against maintenance was similarly harmless. The court gave mother thirty-five days from the date of its initial permanent orders to transfer the money to father. Therefore, the offset was not automatic but was conditional upon mother meeting the court's deadline. On appeal, mother does not contend that she failed to meet this deadline such that any offset actually applied. So she fails to allege that she suffered any harm from this portion of the court's order. *See* C.R.C.P. 61.

¶ 44     Finally, as to the offsets applicable to mother's half of the litigation and tax expenses, these are costs that mother would have owed father regardless of any offset. Had the court not applied the offset, mother would have presumably used father's maintenance payments to reimburse him for those costs. Therefore, the court's award simply eliminated the inefficiency of requiring father to pay mother, only for her to repay him with the same money. And, contrary to mother's assertion, the offsets did not reduce her award to $0. Excluding the time value of a monthly payment, the court's

total maintenance award was $47,796 ($3,414 times fourteen months). The highest potential offset amount was approximately $22,622 (assuming a one-month mortgage offset of $3,500).

¶ 45 Our decision is guided by the different rationales underlying the maintenance and child support statutes. *See In re Marriage of Kann*, 2017 COA 94, ¶ 23 (explaining that, unlike child support, "maintenance is not awarded as a matter of right"). Accordingly, we affirm the maintenance offsets but remand to the district court to correct its order by removing any offsets for child support. If the court finds that father offset any amount of his child support obligation, he must reimburse mother only for those amounts.[8]

### 5. Retroactive Child Support and Maintenance

¶ 46 Mother claims she is entitled to retroactive child support and maintenance. She alleges that she requested $50,085 in retroactive support from August 8, 2023 (when father filed for dissolution) through February 1, 2024 (when the court issued temporary

---

[8] Because father was required to make child support payments into the Family Support Registry, it is unclear from our record whether he ever took offsets against child support. On remand, the court can hear argument and/or evidence on this issue. *See* § 26-13-114(10), C.R.S. 2025 (copies of payment records maintained by the Family Support Registry are admissible as proof of payment).

orders).  She primarily cites policy reasons to support her request.
She also references father's extended absence following a suicide
attempt and her asserted need to resort to public assistance.  We
also reject father's contention that this issue was unpreserved;
mother requested retroactive child support and maintenance, which
the court's permanent orders addressed and denied.

¶ 47     Soon after filing for dissolution, father provided notice,
through counsel, of the temporary orders hearing set for January
31, 2024.  That the hearing could not occur sooner was beyond his
control.  Nonetheless, he told mother, who remained in the marital
home, to ask him if she needed funds.  Mother did not directly
respond to his request, but she requested child support and
maintenance through counsel.

¶ 48     Her early efforts in the case were largely directed toward
restricting father's access to their children, but the parties later
agreed that father would have a phased parenting time structure.
At the January 2024 temporary orders hearing, the court ordered
father to pay child support ($3,530 per month) and maintenance
($3,625 per month).  Father continued paying the temporary
maintenance and child support until the court issued its permanent

orders, setting child support at $896 monthly and maintenance at $3,414 monthly for fourteen months.

¶ 49 Until the court issued temporary orders, both parents were responsible for supporting their children. *See In re Marriage of Alvis*, 2019 COA 97, ¶ 10. The court exercised its wide discretion in declining to make a retroactive award. *See Wells*, 252 P.3d at 1213 (reviewing child support orders for an abuse of discretion). In its permanent orders, the court also noted that, as to retroactive child support and maintenance, mother "did not develop her argument with any evidence . . . other than some general questions about [father] allegedly not giving her money before temporary orders." Because the evidence supports the court's decision, we reject mother's argument.

¶ 50 Finally, while mother argues that the child support award is incongruent with the parties' pre-dissolution lifestyle, this "is only one factor for the court to consider, which does not lock the child into a single standard of living until emancipation." *In re Marriage of Nimmo*, 891 P.2d 1002, 1007 (Colo. 1995). The court considered the parties' pre-dissolution standard of living under section 14-10-115(2)(b)(III), but it noted that they lived well beyond their means

and incurred significant debt. Because the record supports the court's findings, we will not disturb them. *Garrett*, ¶ 9.

### 6. Joint Tax Return

¶ 51 For the 2023 tax year, mother filed a tax return separately from father. Because she claimed the children as her dependents, she realized a $10,780 tax refund. Father incurred a $26,000 tax liability because he could not file as married filing jointly. He asked mother to work with him to amend the tax return to married filing jointly to minimize the tax liability.

¶ 52 Mother argues on appeal that the district court could not require her to file jointly with father. While that may be so, it does not mean that the court could not consider the impact of her filing a separate tax return on the marital estate in its property division. *See Cohan v. Cohan*, 372 P.2d 149, 151 (Colo. 1962) (a court may consider the effect of state and federal income taxes); *In re Marriage of Lafaye*, 89 P.3d 455, 461 (Colo. App. 2003) (same).

¶ 53 The court included the tax liability in calculating the parties' debt. It also characterized the liability as marital debt that could have been avoided. Mother then had the option of (1) working with father to amend the return to reduce their marital tax debt or (2)

forgoing receipt of child tax credits for both children for all future tax filings. If she opted to amend, the court allowed the parties to each claim one child on their respective future tax returns.

¶ 54 So although mother asserts that she was compelled to file an amended tax return, it was one of two options the court offered. That she chose to amend the tax return rather than to forgo splitting the child tax credits does not undermine the court's order.

IV. Mother's Attorney Fees

¶ 55 Mother moved for attorney fees, requesting amounts she owed before her attorney withdrew. The court denied her motion but allowed her to renew her request at the permanent orders hearing. At the hearing, mother asked for $34,000 in attorney fees, and the court denied her request in its permanent orders. It reasoned that mother "receive[d] overall net positive property, while [father] receive[d] net debt," and father had been paying $3,625 in temporary maintenance, a portion of which mother could have used to pay her fees. It also noted that mother's earning potential would increase significantly after she completed her graduate program. Mother now argues that the court abused its discretion by denying her request. We perceive no error.

¶ 56 In domestic relations cases, district courts have discretion to order a party to pay the other party's reasonable attorney fees "after considering the financial resources of both parties." § 14-10-119, C.R.S. 2025. We review a court's decision under this section for an abuse of discretion. *See Davis*, 252 P.3d at 538.

¶ 57 "Courts must consider a request for fees 'in light of [section 119's] equitable purpose,'" which includes ensuring that "neither party suffers 'undue economic hardship' as a result of the dissolution." *de Koning*, ¶ 23 (citation omitted). Under the statute, courts may "equitably apportion costs and fees between parties based on relative ability to pay, and courts have great latitude . . . to craft attorney fee orders appropriate to the circumstances in a given case." *Davis*, 252 P.3d at 538. The focus is on overall economic circumstances, not just the parties' incomes. *Id.*

¶ 58 The court considered father's substantial debt and ongoing maintenance and child support obligations, and it also considered mother's impending increase in earning potential. Importantly, the court had to consider "undue economic hardship" with respect to *both* parties, not just mother. *de Koning*, ¶ 23 (citation omitted).

31

Therefore, we conclude that the district court did not abuse its discretion by denying mother's request for attorney fees.

## V. Judicial Bias

¶ 59    Mother raises several arguments alleging judicial bias and punitive orders but concedes that she did not object or file post-trial motions concerning these alleged errors. For the same reasons explained in Part III.D.3, we decline to consider her unpreserved arguments. *See E.R.S.*, ¶ 35.

## VI. Father's Appellate Attorney Fees

¶ 60    Father requests appellate attorney fees, arguing that mother's appeal is substantially frivolous, groundless, and vexatious. We do not assess attorney fees against pro se parties unless "the party clearly knew or reasonably should have known that [her] action or defense, or any part of the action or defense, was substantially frivolous, substantially groundless, or substantially vexatious." § 13-17-102(6), C.R.S. 2025. An appeal is frivolous only in "clear and unequivocal cases when the appellant presents no rational argument, or when the appeal is prosecuted for the sole purpose of harassment or delay." *Good Life Colo., LLC v. WLCO, LLC*, 2025 COA 8M, ¶ 106 (citation omitted); *see also Black v. Black*, 2020

COA 64M, ¶ 133 ("A claim is groundless if there is no credible evidence to support" it and vexatious if "brought or maintained in bad faith." (citation omitted)).

¶ 61 Although we reject most of mother's contentions on appeal, we cannot say that she presented no rational argument or appealed in bad faith. *See Black*, ¶ 133. Her appeal appears to arise from a concern for her own financial well-being and that of the parties' children, not bad faith or harassment. And she primarily cites relevant legal authority, supporting her contentions with record citations. While most of her arguments were unsuccessful, there is no evidence that she knew or should have known that her appeal was frivolous, groundless, or vexatious. § 13-17-102(6). We therefore deny father's request.

## VII. Disposition

¶ 62 The judgment is affirmed in part and reversed in part, and the case is remanded to the district court to correct the portion of its permanent orders allowing offsets against father's child support obligation.

JUDGE MEIRINK and JUDGE HAWTHORNE concur.